Stanley Gartenstein, J.
The Trusteeship Council Chamber at the United Nations designed by Sven Markelius has no ceiling. Its beams and wiring and plumbing are exposed, rooted in the architects’ concept that "there is nothing as beautiful as the truth.”
If the search for truth is indeed a basic drive of the law, then it should be pursued with courage through to facts and conclusions which may be unflattering but certainly, by definition, never ugly. The history of Jeffrey C.’s contacts with this court is not flattering to the system. It is precisely for this reason that it should be recounted in detail.
Jeffrey, age 15, is now formally before the court for the sixth time after some dozen arrests and a record of mental illness dating back to his seventh birthday. A chronology of his court-related contacts follows.
On May 24, 1969, a delinquency petition was filed alleging acts by Jeffrey which if committed by an adult, would constitute the crime of burglary. This petition was sustained on its merits. Jeffrey was then 9 years old. When he failed to appear on the next court date, a warrant was issued and upon its return, Jeffrey was remanded to Kings County Hospital for observation. From there he was certified to Brooklyn State Hospital and on October 1, 1969, discharged by the court to Queens Children’s Hospital (Creedmore) a mental hygiene facility to which he had been transferred.
Thereafter, on Nov. 16, 1972, a person in need of supervision (PINS) petition alleging truancy was filed and sustained on December 12, 1972. Placement was ordered explored and Jeffrey was ultimately accepted by the Division For Youth (title II). As a result thereof he was placed on probation on June 28, 1973 on condition that he co-operate with the division in the implementation of this placement.
On October 23, 1973, a new petition was filed alleging robbery and assault. While Jeffrey was on remand at Spofford for secure detention pending trial, it was reported that he had slashed his wrists and the court remanded him to Kings County Hospital for observation. From there he was certified once again to Creedmore. On January 9, 1974, the court learned that he had escaped from Creedmore and a warrant was issued and executed. The same day Jeffrey was again *653 remanded to Kings County Hospital, the only alternative open to the court. It is here germane to note that Creedmore upon Jeffrey’s escape, marked his case "discharged”. On March 5, 1974, it was again reported that Jeffrey had escaped from Kings County Hospital and on March 7, 1974, upon being produced in court, Jeffrey was remanded to Spofford for trial on March 11, 1974 at which time the petition was dismissed.
On May 10, 1974 still another petition was filed alleging auto theft. This was sustained after trial on May 16, 1974. On May 22, 1974, Jeffrey was again placed with the Division for Youth, this time under title III, at the New York State Training School. He was assigned to the most secure facilities at Goshen.
On October 21, 1974, Jeffrey was again brought to court via a petition alleging first degree assault (stab wound in the alleged victim’s back) during which proceedings, it was discovered that he had again been sent to Creedmore by the Division for Youth in the interim from which he escaped (again marked "discharged”) and was when apprehended on the new act, a fugitive on a training school warrant. He was then as he still is, and as he was during all interim periods, under the jurisdiction of the Division for Youth. He was returned to the training school on this warrant on November 6, 1974. On November 13, 1974, the court learned that Jeffrey had attempted suicide at Goshen and was being sent to Kings County Hospital by the Division. On November 27, 1974, it was reported that he had again been returned to Creedmore and on December 9, 1974, based on information that Jeffrey was back in secure surroundings at Goshen, the proceeding was dismissed without prejudice.
On January 9, 1975, the instant petition was filed. It alleged that Jeffrey was once again an escapee from Goshen subsequent to the December 9, 1974 report, and while such, had shot a victim with a revolver four times. Once again he was remanded to Kings County Hospital which returned him to the court on January 28, 1975 before the undersigned, at which time the court returned him once again to the division’s Goshen facility on an outstanding training school warrant. Refusing to dismiss even though Jeffrey was allegedly in secure surroundings, the court ordered a trial on February 28, 1975. During the interim, the court again received word that Jeffrey had been transferred, still another time, to Creedmore from which he apparently escapes at will, by the division, and *654 that he had escaped not once but twice. The trial was postponed during interim proceedings and is still pending. On March 10, 1975, Jeffrey who had been apprehended in the apparent commission of another act of violence was brought to the court which ordered that he be returned to the hospital with additional directions that steps be taken to transfer him to the Department of Mental Hygiene’s hospital at Mid-Hudson, a secure facility for adults capable of containing him. Through the co-operation of the office of the Attorney-General of the State of New York, this transfer was effectuated. Soon thereafter, the court learned that a writ of habeas corpus had been brought by the Mental Health Information Service alleging this to be an inappropriate facility. The writ was sustained. Jeffrey is now back at Creedmore which has absolutely no capacity to contain him.
CAPACITY TO STAND TRIAL
In preparation for the impending trial in these proceedings, the Law Guardian moves for a mental examination pursuant to CPL article 730 and related sections, based on her contention that Jeffrey lacks the mental capacity to stand trial. The motion demands that the court, instead of relying on its own clinic and auxilliary services in an ad hoc procedure heretofore utilized to determine ability to stand trial, direct that all the formalities set forth in CPL 730.30 et seq. be followed. These procedures include examination at a place where confined (CPL 730.20, subd 3) by two psychiatrists (CPL 730.20, subd 1) who are chosen by an appropriate director (CPL 730.20, subd 1; CPL 730.10, subd 5).
The question of whether or not a respondent in the juvenile court is entitled to all the formalities available to adult defendants in criminal proceedings when his ability to stand trial is in issue is apparently one of first impression in this State.
In support of this motion, counsel for respondent relies upon Matter of Gault (387 US 1), the basic holding recognizing a juvenile’s right to procedural due process of law under the fourteenth Amendment. The argument that an extension of Gault’s reasoning constitutionally mandates this relief must be tempered by the high court’s emphasis therein that juvenile proceedings are not criminal in nature in the first instance and by the subsequent unwillingness of the high court to extend the Kent-Gault-Winship trend (see Kent v United *655 States, 383 US 541; Matter of Gault, supra; Matter of Winship, 397 US 358) any further (McKeiver v Pennsylvania, 403 US 528).*
As we pointed out in Matter of Anthony S. (73 Misc 2d 187), the Supreme Court’s insistence in Gault on procedural due process specifically excluded the "pre-judicial stages of the juvenile process” (387 US 1, 13, supra). As such, a strong argument could be made for the proposition that a claim of inability to stand trial, as opposed to an affirmative substantive defense of insanity, is a separate proceeding not part of the trial, but in fact held to determine whether or not a trial will go forward. By this reasoning there would be no constitutional mandate for the relief sought.
The court is inclined however, to construe the language in Gault reading "pre-judicial stages of the juvenile stages of the juvenile process” as referring to proceedings not ordinarily held before a court (e.g., intake adjustment conference, see Matter of Anthony S, supra). This would apparently exclude competency proceedings from the exemption in Gault. We respectfully recognize that McKeiver v Pennsylvania (supra), deciding the issue of trial by jury, might, by this reasoning, have been decided otherwise. The court however, is of the opinion that the constitutional safeguards attaching to this very same proceeding, albeit concededly not part of the trial proper, at least place it on a very special level mandating safeguards substantially equal to those applied to the trial itself. (See Bishop v United States, 350 US 961; Pate v Robinson, 383 US 375.) Further, in limiting the trend of Kent-Gault-Winship, the Supreme Court, in McKeiver (supra, p 540) made the criteria of "disruptive of the unique nature of the juvenile process” the crucial factor insofar as exemption from due process requirements was concerned. While this argument might be true of a jury trial as decided in McKeiver, we can in no way see its validity in competency proceedings which have no potential of disrupting the juvenile process and its informal helping hand. We therefore are pursuaded that there in fact exists a constitutional mandate that safeguards extended to defendants in criminal proceedings concerning the ability to stand trial, must be extended to juveniles as well. Even were this not deducible from Supreme Court holdings, we would be constrained to grant the motion based upon *656 holdings in this State attaching crucial importance to these rights. (See Matter of Jay S., 37 AD2d 815; People v Jordan, 35 NY2d 577.) The basis therefore, is unimportant when measured against the similar result.
The motion is granted with a direction that an appropriate order calling for all the formal proceedings contemplated by the CPL be settled on notice for a date within two weeks to be set in the notice of settlement and calendered for signature before the undersigned.
AUXILIARY CONSIDERATIONS
Were the circumstances herein any less frustrating or the pessimism hanging over them any less pronounced, Jeffrey might be considered as a classic textbook example of what is wrong with the juvenile justice system. Regardless of which way one turns, attention must be drawn to the virtual paralysis of a system in which all grinds to a halt while public and private agencies cannot discharge their responsibilities because proper facilities to do so simply have not been provided. Were appropriate programs in operation, this shunting of a human being from agency to agency would not have occurred. At the very least, a facility is needed where juveniles can receive mental treatment in secure facilities separate from adults. We make no comment on a policy which discharges persons officially when they escape from a mental hospital, a matter which is res ipsa loquitur.
Somewhere this process must respond to the needs of society and of those persons trapped within the system.

 It is as yet unclear whether McKeiver halts the trend absolutely or is to be considered only on the issue of denial of trial by jury.