THE PEOPLE OF THE STATE OF NEW YORK ex rel. MARA T. THORPE, as Law Guardian, on Behalf of RICHARD M. (ANONYMOUS), Appellant, v IRA C. CLARK, as Executive Director of the Kings County Hospital Center, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. MARA T. THORPE, as Law Guardian, on Behalf of JACK T. (ANONYMOUS), Appellant, v IRA C. CLARK, as Executive Director of the Kings County Hospital Center, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. MARA T. THORPE, as Law Guardian, on Behalf of CARLTON E. (ANONYMOUS), Appellant, v IRA C. CLARK, as Executive Director of the Kings County Hospital Center, Respondent.

Second Department, April 17, 1978

### APPEARANCES OF COUNSEL

*Charles Schinitsky (Mara T. Thorpe* and *Marcia Rich* of counsel), for Richard M. (Anonymous), appellant.

*Charles Schinitsky (Mara T. Thorpe* and *Sandra Wottitz* of counsel), for Jack T. (Anonymous), appellant.

*Charles Schinitsky (Mara T. Thorpe* and *Gary Sherbell* of counsel), for Carlton E. (Anonymous), appellant.

*W. Bernard Richland, Corporation Counsel (Carolyn E. Demarest* and *Leonard Koerner* of counsel), for respondent.

### OPINION OF THE COURT

O'CONNOR, J.

The issue here presented is whether the Family Court has jurisdiction to commit a juvenile to the Department of Mental Hygiene if it is alleged that the juvenile is a delinquent in a situation where, prior to being adjudicated pursuant to article 7 of the Family Court Act, he is found to be incompetent to defend himself in such proceeding. We hold that the Family Court has such jurisdiction, but that it must be exercised only in a manner consistent with the juvenile's constitutional right to due process.

These appeals present a novel question concerning the rights of juveniles charged as delinquents. Each of the three petitioner-appellants has been charged by a petition filed in the Family Court with committing acts which, had they been committed by an adult, would have constituted felonies (see Family Ct Act, § 712).

Richard M. was accused of several counts of robbery, assault

and weapons possession arising out of the robbery of two elderly gentlemen. In the course of the robberies he used an ice pick and thereby inflicted minor wounds on his victims. On May 4, 1977, two days after the petitions were filed in the Family Court seeking to adjudicate him (he was then 14 years old) a juvenile delinquent (see Family Ct Act, art 7), he was remanded to Kings County Hospital to determine his fitness for trial. The examination was ordered at the request of the Law Guardian, and was conducted pursuant to CPL article 730.

Although there is no express authority in the Family Court Act for an examination of the fitness of a juvenile to proceed through the adjudication process, the courts have upheld the use of the corresponding section of the CPL providing for such an examination for adults charged with a crime. In *Matter of Jeffrey C.* (81 Misc 2d 651), the court concluded that to overcome this omission in the Family Court Act and to guarantee due process to the juvenile, the Constitution mandates that the juvenile at least receive due process in the making of a determination as to whether he is competent to proceed. Thus the juvenile, while still shielded from a full-blown criminal proceeding, is assured his right to due process when his ability to stand trial is in issue.

On June 7, 1977 two psychiatrists (Drs. Zeiguer and Barnes) concluded that Richard was not competent to stand trial. Their diagnosis was severe mental retardation, hyperkinetic reaction and unsocialized aggressive reaction. Their report concluded: "Richard * * * is a boy who lacks adequate judgment stemming mostly from the cognitive shortcomings implecated [sic] in his primary diagnosis as well as from his impulsivity and short attention span which tends to make him act out on impulse and without foreseeing consequences. His acquisition of social values is far from completed, and he does not have an internalized set of rules at this point. This makes it mandatory for him to function under supervision. This supervision could be provided either by a careful joint action of a probation officer and a Puerto Rican social worker—joint efforts in organizing a community setting within his neighborhood that would tend to provide for precarious controls or in absence of resources to implement that, or in case of failure, then it would be necessary for him to be taken care of in an institution for the severely retarded with emotional disturbance (as a second standby plan)".

On June 9, 1977 the senior psychiatrist at the hospital prepared his own report confirming that Richard was incompetent to stand trial. He, too, recommended court supervision with community counselling, but indicated that placement in a residential treatment facility for severely retarded individuals with emotional problems would be necessary if his antisocial behavior continued. Based on those reports, Judge BERMAN of the Family Court found that the boy was "potentially dangerous" and remanded him to Kings County Hospital for "appropriate treatment or certification."

Dr. Zeiguer then wrote to the court expressing disappointment that his recommendation for out-patient counselling and supervision had not been followed. Further examination by Drs. Kobrin and Monge confirmed the finding of the boy's incompetence to proceed. It was also revealed that the boy's application for admission to the Brooklyn Developmental Center was denied because he had been found to be potentially dangerous. However, the doctors continued to recommend constant supervision and suggested a residential placement facility only if constant supervision could not be provided.

On August 25, 1977 the Family Court conducted a hearing, after which it concluded that Richard was incompetent to proceed to an adjudication hearing. The Law Guardian then sought to have the petition dismissed on the grounds that Richard was mentally retarded and there was virtually no possibility of his becoming competent to proceed. Opposing counsel was willing to consent on condition that appellant be committed for one year pursuant to CPL 730.50, which provides for the commitment of an *adult* who, charged with the commission of a felony, is found incompetent to proceed to trial. The court, acknowledging the lack of any express provision providing for commitment of a juvenile not yet adjudicated a delinquent, but charged with serious acts and found to be incompetent to proceed, committed Richard to the Department of Mental Hygiene pursuant to section 231 of the Family Court Act. In the interim he was remanded to Kings County Hospital. Once there the Department of Mental Hygiene refused to accept the boy on the ground that the Family Court had not been authorized to commit him in this manner.

On September 27, 1977 the Law Guardian commenced a habeas corpus proceeding in the Supreme Court. Mr. Justice SCHOLNICK, after a hearing, dismissed the writ and concluded

that sections 255 and 231 of the Family Court Act authorized the commitment. Following his decision, the Law Guardian moved for reargument, submitting an affidavit from Dr. Zeiguer that alleged that Richard's lengthy stay in the psychiatric ward of Kings County Hospital was antitherapeutic since the boy was not psychotic but retarded. The court granted reargument but adhered to its original decision.

Jack T., who was then 13 years old, was accused of several counts of reckless endangerment, menacing, attempted assault and weapons possession arising out of his firing of a handgun in a Brooklyn subway station. The two petitions seeking to adjudicate him a juvenile delinquent were filed in the Family Court on October 12, 1976. He was then remanded to Kings County Hospital to determine his fitness for trial. The examination was ordered at the request of the Law Guardian and was conducted pursuant to CPL article 730. A psychiatric report by Dr. Kobrin concluded that he was mildly retarded and lacked the mental capacity to stand trial. The juvenile was paroled and the matter adjourned. Prior to a court hearing to determine competency, a new petition was filed in the Family Court seeking to adjudicate Jack a delinquent. The new petition charged him with acts which, had they been committed by an adult, would have constituted criminal trespass, criminal possession of a weapon, menacing and attempted assault. He was again remanded to Kings County Hospital. By report dated August 23, 1977, Drs. Zeiguer and Barnes concluded that the boy was incompetent to stand trial. The diagnosis was severe receptive language problems and cognitive impairment from mild mental retardation, epilepsy, hyperactive syndrome and specific language disability. He was found not to be psychotic and the prognosis was stated to be "good". The report recommended comprehensive educational, recreational and family support in a framework of community counselling.

On August 24, 1977, a hearing was held before Judge Di Blasi in the Family Court on the first two petitions. The court confirmed the psychiatric findings and found the juvenile incompetent to proceed to the adjudication hearing. Over objection of the Law Guardian, the court committed Jack to the Department of Mental Hygiene for care and treatment in an appropriate institution for one year. Pending the transfer he was remanded to Kings County Hospital. Judge Di Blasi, recognizing that this was an issue of first impression and

acknowledging the lack of statutory directive, analogized to the adult provisions of the Criminal Procedure Law and found authority for the commitment in CPL 730.50. He stated that in view of the nature of the acts allegedly committed by Jack, "[u]nder no circumstances will this court entertain the suggestion that * * * [the boy] be placed back in the community." Judge DEUTSCH of the Family Court, presiding at the hearing on the third petition filed against Jack, also found him incompetent to proceed. He stated that the lack of a statutory remedy providing for the disposition of such a case was a "legislative oversight" and found that CPL article 730 should be applied. He, too, found that "the serious nature of the acts which * * * [the boy] has been charged with committing and his present psychological condition, preclude his release into the community." Absent legislative guidance, he committed Jack for one year pursuant to CPL 730.50.

On September 27, 1977 the Law Guardian commenced a habeas corpus proceeding, which was heard with the proceeding instituted by Richard M. Mr. Justice SCHOLNICK, reaching the same conclusion, dismissed the writ, finding that sections 255 and 231 of the Family Court Act authorized the commitment. A motion for reargument similar to that made on behalf of Richard M. was disposed of in the same manner as was the motion made on behalf of Richard M.

Carlton E., who was then 12 years old, was accused of several acts, which, had they been committed by an adult, would have constituted the crimes of arson, reckless endangerment and reckless endangerment of property. The charges arose out of his setting at least six different fires at various locations in two occupied apartment houses. The petitions seeking to adjudicate him a delinquent were filed with the Family Court on July 12, 1977. He was then remanded to Kings County Hospital to determine his fitness to proceed. The examination was ordered at the request of the Law Guardian and was conducted pursuant to CPL article 730. The psychiatric reports concluded that he was incompetent to stand trial and suffered from a chronic organic brain syndrome. The court-ordered competency hearing was held between August 26 and September 1, 1977. The testimony at the hearing reveals that the youth was diagnosed as having an adjustment reaction to childhood, a specific learning disability and borderline retardation (later changed to "mild" retardation). No psychosis was found. The reports recommended immediate

and intensive care followed by enrollment in a special school for learning disabled and mildly retarded children with out-of-school programs and counselling for the youth and his family.

At the end of the hearing, Judge ESQUIROL found the boy to be incompetent to proceed to the adjudication hearing. He committed him to the custody of the Commissioner of the Department of Mental Hygiene for a period of up to one year. As with the other two cases, the court could not find express authority in the Family Court Act for such action, but did find that the youth was "a threat not only to the safety and to the welfare of the community, but a real threat to his own welfare." The court stated that the basis for the commitment was CPL 730.50. The Department of Mental Hygiene notified the court that it could not accept a nonadjudicated juvenile.

On September 27, 1977 the Law Guardian commenced a habeas Corpus proceeding, which was heard with the proceedings commenced by the two other appellants. Mr. Justice SCHOLNICK reached the same conclusion and dismissed the writ, finding that sections 255 and 231 of the Family Court Act authorized the commitment. A similar motion for reargument was made and granted, but the court adhered to its original decision.

The three youths appeal from the dismissal of their habeas corpus proceedings. They claim that their commitment to the Department of Mental Hygiene was without lawful authority and violated their due process rights. Appellants argue that section 231 of the Family Court Act grants no authority for commitment because that section was repealed by implication with the recodification of the Mental Hygiene Law in 1972 (L 1972, ch 251).

Section 231 of the Family Court Act reads: "§ 231. Jurisdiction over mentally retarded children. If it shall appear to the court that any child within its jurisdiction is mentally retarded, the court may cause such child to be examined as provided in the mental hygiene law and if found to be mentally retarded as therein defined, may commit such child in accordance with the provisions of such law" (L 1976, ch 853, § 4).

It is conceded that the youths have been determined to be mentally retarded. Thus section 231, if it has not been repealed, authorizes commitment in accordance with the provisions of the Mental Hygiene Law.

Section 231 was enacted in 1976. The language of the

section was previously part of subdivision (a) of section 232 of the Family Court Act, as enacted in 1962. In 1972 the Legislature recodified the Mental Hygiene Law. Prior to 1972, section 124 of the former Mental Hygiene Law provided for involuntary admission of mentally defective persons to the jurisdiction of the Mental Hygiene Department on a judicial order and provided for the procedure to be followed. The Family Court was specifically referred to as a court empowered to entertain such a proceeding (former Mental Hygiene Law, § 124, subd 1). The recodification eliminated judicial certification pursuant to the Mental Hygiene Law and replaced the procedure with an administrative process which includes an application by certain specifically enumerated persons to certify an applicant for acceptance by the Department of Mental Hygiene (see Mental Hygiene Law, § 33.27 *et seq.*). Appellants argue that the inconsistency in the two statutes (section 231 of the Family Court Act provides for judicial certification while the Mental Hygiene Law does not) means that the provision in the Family Court Act has been repealed by implication. ·

■ The general rule of statutory interpretation is that a subsequent statutory provision prevails over a pre-existing and irreconcilably conflicting provision which is not expressly repealed (see McKinney's Cons Law, of NY, Book 1, Statutes, §§ 391, 398). The legislative intent, if it can be determined, is controlling *(ibid., § 398)*. Chronologically, section 231 of the Family Court Act, enacted in 1976 (L 1976, ch 853) is a subsequent statutory provision to section 33.27 of the Mental Hygiene Law, which was enacted in 1972. However, appellants argue that the re-enactment of a statute in language substantially similar to that embodied in predecessor statutes does not prevail over inconsistent statutes merely because of the later re-enactment.

■ Although section 231 was re-enacted in substantially the same language, it was enacted as an entirely separate statute. It cannot be viewed as the careless re-enactment of part of the language of a statute that had been on the books for 60 years (cf. *People v Messinger,* 43 AD2d 15). The provisions of the Mental Hygiene Law omit any reference to juveniles. However, the Family Court Act specifically provides for their care and treatment. The enactment of section 231 was an effort by the Legislature to separate the provisions for the physically handicapped and mentally retarded into two sections in recognition of the different problems of each group (compare sec-

tions 231 and 232 of the Family Ct Act; see, also, Governor's Memorandum of Approval, McKinney's 1976 Session Laws of NY, p 2448). Furthermore, a review of the *Messinger* case *(supra)* fails to justify appellants' reliance thereon. A reading of that case shows that the primary ground for affirmance was the existence of a Penal Law section which specifically provided for inconsistencies between sentencing for crimes defined within the Penal Law and those defined elsewhere.

Section 231 of the Family Court Act has therefore not been repealed by implication. But that section does require commitment to be in accordance with the Mental Hygiene Law. Section 33.27 of the Mental Hygiene Law provides for the involuntary admission of a person on medical certification. It establishes a thorough procedure to ensure that no person is involuntarily detained in an institution without adequate safeguards. It has been said that such an involuntary commitment to a mental institution involves a "massive curtailment of liberty" (see *Humphrey v Cady,* 405 US 504, 509). The restriction of a person's liberty by the State in such a manner can only be accomplished with adequate respect to due process and equal protection of the law (see *Jackson v Indiana,* 406 US 715). Juveniles in a delinquency proceeding are similarly entitled to such protections (see *Matter of Gault,* 387 US 1; *Matter of Jeffrey C.,* 81 Misc 2d 651, *supra). Section 33.27 is not attacked on this appeal as being an unconstitutional method of involuntary commitment.

The law therefore already provides a method for safeguarding the constitutional right of an individual who is to be involuntarily committed to an institution. The use of that procedure avoids the problems raised here. These youths each received a full hearing with all of the requisite due process guarantees on the *issue of their competency* to proceed to the adjudication hearing. However, only after they were found to be incompetent did the court then order, without any further proceedings, their involuntary commitment. None of the procedures contained in section 33.27 were followed. We make no determination as to whether due process was denied any of the youths in each case. However, the procedure used by the Judges here involved resulted in the use of at least two different means to reach the same result. Unless a uniform procedure is at once established and followed, each involuntary juvenile commitment hereafter will mandate an *ad hoc* examination to determine whether due process was satisfied.

The record in each case supports the findings of the respective Family Court Judges who found each of these youths severe threats, not only to society, but to themselves. But the procedural safeguards of section 33.27 must be followed before they can be involuntarily committed. By providing this procedure for the future, an *ad hoc* investigation of the commitment method employed in each case will be unnecessary.

■ Section 231 of the Family Court Act, which gives the Family Court jurisdiction to deal with a mentally retarded child, mandates that the commitment be in accordance with the Mental Hygiene Law. Section 33.27, however, requires that before a person can be placed there must be "an application for the admission of such person." Subdivision (b) thereof provides:

"(b) Such application must have been executed within six months prior to such admission. It may be executed by any one of the following:

"1. any person with whom the person alleged to be mentally retarded resides.

"2. the father or mother, husband or wife, brother or sister, or the child of any such person or the nearest available relative.

"3. the committee of such person or his judicially appointed guardian.

"4. an officer of any well recognized charitable institution or agency or home in whose institution the person alleged to be mentally retarded resides.

"5. the director of community services or social services official, as defined in the social services law, of the city or county in which any such person may be.

"6. the director of the facility in which the resident resides.

"7. the director of the division for youth, acting in accordance with the provisions of section five hundred seventeen of the executive law."

Subdivision (c) provides: "(c) Such application shall contain a statement of the facts upon which the allegation of mental retardation and need for care and treatment are based and shall be executed under penalty of perjury but shall not require the signature of a notary public thereon." None of the persons listed in subdivision (b) is available to execute the application in any of the three appeals before us. In fact, the psychiatrists here all initially recommended that the youths

not be immediately placed in a residential treatment center. We hold that in circumstances such as these, where a juvenile is found to be incompetent to proceed to an adjudication hearing, and the court finds that the youth is a threat to society as well as to himself, the Family Court can consider the request by the Law Guardian for an examination pursuant to CPL article 730 to establish whether the youth is competent to proceed as such application. The court can then consider the guardian's request to be an application sufficient to satisfy subdivisions (b) and (c) of section 33.27 of the Mental Hygiene Law in the event that the youth is found to be incompetent to proceed. With this procedure, following a determination that the youth is incompetent to proceed, the court would then direct that the procedures of section 33.27 be followed. The application, considered as one made by the Law Guardian upon the request for a competency examination, satisfies subdivision (b). The findings of the court in ruling that a juvenile is incompetent to proceed will be considered the "statement of the facts upon which the allegation of mental retardation and need for care and treatment are based" in satisfaction of subdivision (c).

Respondent's reliance upon CPL 730.50 is inapposite. The Criminal Procedure Law was not designed to provide for the care and treatment of children. Indeed, it was the intent of the Legislature to shelter the young from a full-blown criminal proceeding which led to the enactment of article 7 of the Family Court Act. Furthermore, the Criminal Procedure Law has little applicability in the Family Court. By its terms, it applies only to criminal actions and proceedings in a criminal court (see CPL 1.10, 1.20). Moreover, at this point, appellants have only been charged with being delinquents. They have not yet been adjudicated. Thus, the use of criminal procedures is questionable when the youths have not yet been adjudicated to be delinquents and, because of their condition, probably will not be so adjudicated.

■ Section 255 of the Family Court Act, which authorizes the court to order the co-operation of other officials and organizations, is only effective within the scope of the court's legal authority. The orders to commit the youths were made pursuant to sections 231 and 255 of the Family Court Act, but section 231 requires that the procedures of section 33.27 of the Mental Hygiene Law be followed. Those procedures having been omitted, the invocation of section 255 cannot be said to

have been within the court's legal authority. Section 255 could be used to order the proper officials to co-operate in following the commitment procedures provided herein. But the use of sections 255 and 231 alone fails to guarantee a uniform procedure so that juveniles, subject to being committed involuntarily to the Department of Mental Hygiene will be subject to the same procedures and the same due process and equal protection of the law.

As the Court of Appeals stated in *People ex rel. Wayburn v Schupf* (39 NY2d 682, 690): "The children who come before Family Court fall largely into two categories—those who are no longer subject to the guidance or effective control of their parents or guardians, and those who have no custodians at all. Indeed this is what has contributed to their difficulties. In this circumstance to a very real extent Family Court must exercise a substitute parental control for which there can be no particularized criteria." The court must act as *parens patriae*. These youths, charged with serious crimes, have been found incompetent to proceed and mentally retarded. Each Judge found the youth before him to be a threat to society and to himself. The Family Court must consider both of those factors in reaching a just disposition of the cases before it (Family Ct Act, § 711). Consistent with protecting the rights of these youths, the court has an inherent power in its role as *parens patriae* to ensure that, before they are committed, their best interests are secured in a uniform manner. The rationale of this policy is that: "the State must intervene in order to protect an individual who is not able to make decisions in his own best interest. The decision to exercise the power of *parens patriae* must reflect the welfare of society, as a whole, but mainly it must balance the individual's right to be free from interference against the individual's need to be treated, if treatment would in fact be in his best interest. Because of the variables, the question of whether this power should be exercised in a given situation is quite difficult. (See *Cudy v. State,* 237 Ark. 927; *Mannus v. State ex rel. Dewitt School,* 240 Ark. 42; Note, Compulsory Medical Treatment and the Free Exercise of Religion, 42 Ind. L.J. 386; John and Peterson, Legal Status of Christian Science Treatment, 10 Med. Trial Tech. Q. 13; How, Religion, Medicine and Law, 3 Can. B.J. 365; Note, Compulsory Medical Treatment: The State's Interest Re-Evaluated, 51 Minn. L. Rev. 293.)" *(Matter of Weberlist,* 79 Misc 2d 753, 756.) It is apparent that the court has the inherent

power to fashion an adequate remedy in effectuating this policy (see *People v Lally,* 19 NY2d 27 [wherein the court read certain constitutional protections into a statute concerning the commitment of a criminal defendant who is found not guilty by reason of insanity]).

The problems presented in this case have arisen because of a legislative oversight. It is conceded that existing laws would adequately deal with an adult charged with a crime but found incompetent to proceed (see CPL 730.40, 730.50). Furthermore, if the appellants had been adults and not charged with a crime, civil commitment pursuant to section 33.27 of the Mental Hygiene Law was available. If appellants had been adjudicated delinquents they could then have been placed in restrictive placement (see Family Ct Act, § 753-a). It is inconceivable that the Legislature intended that a juvenile charged with a serious crime, ascertained to be a threat to himself and to society, and found incompetent to proceed, should be returned to his community without some procedure established for his care and treatment. It is hoped that this oversight will soon be corrected by legislative action. In the meantime, the procedures here outlined adequately provide for the protection of the juveniles' rights while upholding the jurisdiction of the Family Court to adequately deal with these circumstances.

Each of the judgments should be reversed and the writs granted to the extent of directing that the proceedings be remanded to the Family Court with directions that the Family Court follow the procedures of section 33.27 of the Mental Hygiene Law and consider the application required therein to have been made at the time of the request for an examination pursuant to CPL article 730. In the interim, appellants are to remain in the custody of the respondent. The findings of the Family Court at the competency hearings (see CPL 730.30) shall be considered the statement of facts required by subdivision (c) of section 33.27 of the Mental Hygiene Law. In implementing this decision the Family Court may wish to use section 255 of the Family Court Act to ensure the co-operation of any other necessary officials or agencies.

HOPKINS, J. P., MARTUSCELLO and LATHAM, JJ., concur.

Three judgments of the Supreme Court, Kings County, each entered October 24, 1977, reversed, on the law, without costs or disbursements, and applications granted to the extent of directing that the proceedings be remanded to the Family

Court for further proceedings consistent with the opinion of Mr. Justice O'CONNOR. In the interim appellants are to remain in the custody of the respondent.