OPINION OF THE COURT
Phoebe K. Greenbaum, J.
The respondents were charged with acts which, if done by an adult, would constitute the crimes of murder in the second degree (Penal Law, § 125.25); manslaughter in the first degree (Penal Law, § 125.20); manslaughter in the second degree (Penal Law, § 125.15); and criminally negligent homicide (Penal Law, § 125.10).
The petitions allege that on May 10, 1981 the two respondents acting in concert with intent to cause the death of another did intentionally push Furguron E. and Jabril B. into Jamaica Bay, thereby resulting in the death by drowning of Furguron E. and Jabril B.; or under circumstances evincing a depraved indifference to human life the respondents recklessly engaged in conduct which created a grave risk of death to another by pushing Furguron E. and Jabril B. into Jamaica Bay, thereby resulting in their deaths by drowning.
*681 Respondent Robert G. was seven years, five months old and respondent Darwin J. was nine years, six months old at the time of the alleged offenses.
Due to their respective ages, the respondents are before the court charged with juvenile delinquency pursuant to subdivision (a) of section 712 of the Family Court Act which defines a juvenile delinquent as “A person over seven and less than sixteen years of age who, having done an act that would constitute a crime, (i) is not criminally responsible for such conduct by reason of infancy, or (ii) is the defendant in an action ordered removed from a criminal court to the Family Court pursuant to article seven hundred twenty-five of the criminal procedure law.”
The common-law complete defense of infancy by reason of immaturity is not available nor applicable to the respondents by virtue of the enactment of the Family Court Act which “absolves children under seven of any legal responsibility for violation of the Penal Law and subjects children between the ages of 7 and 16 to the less severe penalties and lesser stigma of delinquency adjudication.” (Matter of Robert M., 110 Misc 2d 113, 114.)
During the 1982 Extraordinary Session of the New York State Legislature, legislation was enacted amending the Family Court Act with respect to juvenile delinquency proceedings. Chapters 920 and 926 of the Laws of 1982, effective July 1, 1983, repeal the juvenile delinquency provisions contained in article 7 of the Family Court Act and added to such act a new article 3 entitled “Juvenile Delinquency”. Article 3 does not alter the basic definition of “[j]uvenile delinquent” as stated in subdivision (a) of section 712 of the Family Court Act.
The court has carefully considered the new article 3 as to its effect, if any, on the finding and disposition of the respondents. Where applicable, provisions of article 7 will be cross-referenced with their counterparts in the new article 3.
Pursuant to section 748-a of the Family Court Act (see Family Ct Act, art 3, § 322.2, as added by L 1982, ch 920, § 1), the court held extensive hearings to determine whether the respondents were incapacitated persons. Subdivision (b) of section 748-a of the Family Court Act reads *682 as follows: “Upon receipt of the examination reports [referred to in Family Ct Act, § 748-a, subd (a)], the court shall conduct a hearing to determine whether the respondent is an incapacitated person. The respondent, the counsel or law guardian for the respondent, the petitioner, the attorney presenting the petition and the commissioner of mental health or the commissioner of mental retardation and developmental disabilities, as appropriate, shall be notified of such hearing at least five days prior to the date thereof and afforded an opportunity to be heard.” After hearing all evidence presented, the court found by overwhelming evidence that the respondents were incapable of standing trial. They did not have the capacity to understand the charges against them or to assist their attorneys in their defenses.
The procedure to determine capacity in a juvenile delinquency proceeding found in section 748-a of the Family Court Act is a new addition to the Family Court Act, having been added by chapter 531 of the Laws of 1979 (as amd by L 1981, ch 331, § 2). The detailed procedure outlined in the statute filled a glaring gap in the juvenile justice laws while simultaneously meeting the demands of due process.
The enactment of the statute occurred as a direct result of the call of the judiciary on the State Legislature to fill the void created by the total lack of any incapacity procedures in article 7 of the Family Court Act. As the Appellate Division stated in the leading case of People ex rel. Thorpe v Clark (62 AD2d 216, 229): “The problems presented in this case have arisen because of a legislative oversight. It is conceded that existing laws would adequately deal with an adult charged with a crime but found incompetent to proceed (see CPL 730.40, 730.50). Furthermore, if the appellants had been adults and not charged with a crime, civil commitment pursuant to section 33.27 of the Mental Hygiene Law was available. If appellants had been adjudicated delinquents they could have been placed in restrictive placement (see Family Ct Act, § 753-a). It is inconceivable that the Legislature intended that a juvenile charged with a serious crime, ascertained to be a threat to himself and to society, and found incompetent to proceed, should be *683 returned to his community without some procedure established for his care and treatment. It is hoped that this oversight will soon be corrected by legislative action.”
The Legislature took up the call. An extensive bill to amend the Family Court Act and the Mental Hygiene Law to create a procedure for determining and dealing with juveniles who may be incapable, because of mental disability, of understanding or participating in hearings held pursuant to the Family Court Act was introduced and approved by both houses of the Legislature. The Assembly report on bill No. 3915-A dated June 14, 1979 found that the amendments were “comprehensive in safeguarding a juvenile’s rights for determining incapacity” (bill jacket, L 1979, ch 531) in that they provided a system for insuring that under certain circumstances a determination of incapacity will result in dismissal of the juvenile delinquency petition; a system for determining when a juvenile is no longer incapacitated; and a system for outlining the terms of care and treatment of a mental disability.
The amendments went into effect on September 10, 1979. This court has been unable to find other cases construing the new statutes. Of ultimate importance in applying these laws to individual juveniles is for the courts to recognize that although the statutes were designed to emulate CPL article 730 (see Assembly report on bill No. 3915-A, supra), basic definitional differences exist which impact on the court’s findings of incapacity. While CPL 730.10 (subd 1) defines “[incapacitated person” as a defendant “who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense.” Subdivision (L) of section 712 of the Family Court Act (see Family Ct Act, art 3, § 301.2, subd 13, as added by L 1982, „ch 920, § 1) pinpoints incapacity to mental illness, mental retardation, or developmental disability as defined in subdivisions 20, 21 and 22 of section 1.03 of the Mental Hygiene Law.
Said afflictions are defined as follows: Mental illness means “an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment *684 and rehabilitation.” (Mental Hygiene Law, § 1.03, subd 20.)
Mental retardation means “subaverage intellectual functioning which originates during the developmental period and is associated with impairment in adaptive behavior.” (Mental Hygiene Law, § 1.03, subd 21.)
Developmental disability means a disability of a person which:
“(a) (1) is attributable to mental retardation, cerebral palsy, epilepsy, neurological impairment or autism;
“(2) is attributable to any other condition of a person found to be closely related to mental retardation because such condition results in similar impairment of general intellectual functioning or adaptive behavior to that of mentally retarded persons or requires treatment and services similar to those required for such persons; or
“(3) is attributable to dyslexia resulting from a disability described in subparagraph (1) or (2) of this paragraph;
“(b) originates before such person attains age eighteen;
“(c) has continued or can be expected to continue indefinitely; and
“(d) constitutes a substantial handicap to such person’s ability to function normally in society.” (Mental Hygiene Law, § 1.03, subd 22.)
Since from the onset of this proceeding it appeared that one or both respondents may be incapacitated, the court ordered, pursuant to subdivision (d) of section 741 of the Family Court Act (similar in substance to Family Ct Act, art 3, § 322.1) that both respondents be examined in accordance with section 251 of the Family Court Act by two qualified psychiatrists or one qualified psychiatrist and one certified psychologist.
Upon receipt of the doctors’ examination reports, the court notified the Commissioner of Mental Health of the hearing date in order to afford the commissioner an opportunity to be heard. (Family Ct Act, § 748-a, subd [b].) Commencing on the scheduled date, the court held an extensive hearing to determine whether the respondents were incapacitated persons as defined by subdivision (L) of *685 section 712 of the Family Court Act. Pursuant to said statute, an incapacitated person is “a respondent who, as a result of mental illness, mental retardation or developmental disability as defined in subdivisions twenty, twenty-one and twenty-two of section 1.03 of the mental hygiene law, lacks capacity to understand the proceedings against him or to assist in his own defense.”
Concerning the capacity of the respondent Robert G., Dr. Ellen Aronoff, certified staff psychologist at Elmhurst General Hospital, testified that she administered many psychological tests to this respondent.
In all of these tests there was a consistent showing that Robert’s performance was below his chronological age. He showed a developmental lag in perceptual and conceptual areas. He exhibited poor critical judgment, confusion, misconceptions and personalized interpretations. Many of his percepts were of imperfect, damaged, mutilated objects, victims of violence and aggressions resulting from anger and frustration. Dr. Aronoff recommended intensive care and supportive treatment.
Dr. Ruth Feibel, a qualified psychiatrist who is an assistant attending psychiatrist at Elmhurst General Hospital, testified that she saw Robert G. almost every day from May through October of 1981. Dr. Feibel stated that Robert was mentally ill. His senses are normal but his perceptions are distorted. He sees the world as a place of violence, fire, anger, hostility. He is preoccupied with violence. He shows some depressive features, some maladoptive features. They are not healthy in terms of making a person capable of functioning in a group or society. In his way of behaving, in his way of acting, feeling and thinking he presents some of the mental problems which may interfere with his functioning, with his development, with his growth. The final diagnosis was adjustment reaction with mixed disturbance of emotions and conduct, with marked anxiety and depressive symptoms; typical specific developmental disorder with some perceptual motor difficulties. Dr. Feibel noted that the child could be dangerous if not given treatment. He needed further intensive treatment in a therapeutic atmosphere at a residential treatment facility after his discharge from the hospital particularly in view of his *686 mother’s lack of participation and co-operation with Robert’s treatment from May to that date in October. Further, Dr. Feibel testified that Robert G. presented a developmental lag and that he was less capable than other children his age to understand what the meaning of a trial is. She tried to discuss the specific charges against Robert with him, but it was beyond his comprehension. Robert felt that the decedents would be brought to the hospital, something would be done, and they would be brought to life. In this respect, Dr. Feibel continued, Robert was younger than others in cognitive ability. A child who is seven and one-half years old understands death, but the irreversibility of death is beyond his comprehension. Dr. Feibel stated that Robert did not completely understand the charges against him, nor did he fully grasp the meaning of death. Further, he cannot separate the facts from emotional experience or fantasy from actuality and he was not capable, therefore, of giving a meaningful account to help anybody defend him.
After hearing all of the psychological and psychiatric evidence presented, the court found that respondent Robert was incapable of standing trial because he lacked the capacity to understand the charges against him or to assist his attorney in his defense. He was found to be an incapacitated person pursuant to subdivision (L) of section 712 of the Family Court Act in that after full consideration of all the psychiatric and psychological evidence offered concerning respondent Robert viewed in light of the incapacity statutes of the Family Court Act, the court found that respondent Robert was suffering from a developmental disability as defined in section 1.03 (subd 22, par [a], cl [2]) of the Mental Hygiene Law. He was found to exhibit a typical developmental disorder with some perceptual motor difficulties manifested by specific delays in development (not in all areas of development). This originated before the age of 18 years, it had continued to the date of the hearing and it constitutes a substantial handicap to Robert’s ability to function normally in society and requires long-term treatment. Dr. Feibel also found Robert to be mentally ill but the court is statutorily constrained to reject that finding since only one and not two qualified psychiatrists testified concerning respondent Robert. (Family Ct Act, § 741, subd [d].)
*687 Concerning the capacity of the respondent Darwin J., Dr. Myles Schneider, a qualified psychiatrist, employed by the Psychiatric Clinic for the Supreme Court, New York County, testified that he examined Darwin at the request of his attorney. He found that Darwin’s level of depression and his level of psychological need to avoid the issue during the incident herein rendered it very difficult for him to be able to deal with the charges and discuss them in a rational way. He was also not aware of what legal proceedings are.
Dr. Schneider stated that Darwin presents a conduct disorder and a specific developmental delay in reading; both of which are mental disorders. Dr. Schneider’s diagnosis was adjustment disorder with depressed mood, severe; atypical conduct disorders, developmental reading disorder; repeatedly abnormal electroencephalograms involving the temporal lobes; history of head trauma.
Dr. Herman R. Schecter, a qualified psychiatrist at Queens Children’s Hospital, testified that Darwin J. could participate in a trial or a hearing as well as a six- or seven-year-old child and not beyond that level. The doctor stated that the respondent’s maturation was delayed in certain areas. He had evidence of delayed learning abilities in a number of areas suggesting brain injury or minimal brain dysfunction which would affect his ability to understand what would occur in the courtroom and his ability to assist his counsel.
Dr. Schecter’s diagnoses were similar to that of Dr. Schneider. These dysfunctions and disorders effect Darwin’s ability to interpret various data and to co-ordinate and integrate information and to act upon it. This would effect Darwin’s ability to understand what goes on in the courtroom and to assist his counsel.
Dr. Feibel stated that Darwin was mentally ill, that he had problems in his ability to control his impulses, in his ability to show emotions. This child has difficulties in relating to adults and to children. Dr. Feibel cosigned a report with Dr. Whie, resident in psychiatry at Elmhurst Hospital, this respondent’s exhibit No. I, in evidence. This report states that Darwin seems to understand the concept of death. The diagnoses were similar to that of Dr. Schnei *688 der and Dr. Schecter, to wit: Conduct disorder, undersocialized, aggressive with depressive and anxiety features; developmental reading disorder; soft neurological signs; psychostressor — broken home; poor in school. It was recommended that Darwin needed long-term treatment in a facility such as Queens Children’s Hospital.
After hearing all of the psychological and psychiatric evidence presented, the court found that the respondent Darwin was incapable of standing trial because he lacked the capacity to understand the charges against him or to assist his attorney in his defense. In other words, respondent Darwin was found to be an incapacitated person pursuant to subdivision (L) of section 712 of the Family Court Act in that after full consideration of all the psychiatric and psychological evidence viewed in light of the new incapacity statutes, this court found that the respondent, Darwin, was an incapacitated person as a result of a mental illness as defined in subdivision 20 of section 1.03 of the Mental Hygiene Law. The testimony indicated that respondent Darwin suffered from a mental condition manifested by a disturbance in behavior, feeling, thinking, and judgment and that he required care, treatment, and rehabilitation.
In addition, respondent Darwin was found to be suffering from a developmental disability as defined in section 1.03 (subd 22, par [a], cl [1]) of the Mental Hygiene Law — a developmental disability attributable to neurological impairment. The medical evidence revealed abnormal electroencephalograms involving temporal lobes, a history of head trauma and soft neurological signs. This disability can be expected to continue indefinitely and constitutes a substantial handicap to Darwin’s ability to function normally in society.
From the inception of these hearings, the respondents have resided away from their homes and in treatment facilities. On the advice of their treating psychiatrists, the court found that the respondents needed long-term treatment and that to return them to their homes before treatment was completed would counteract the progress achieved towards a therapeutic goal.
*689 After the court makes an incapacity finding, the procedure is governed by subdivision (d) of section 748-a of the Family Court Act which reads, “If the court finds that the respondent is an incapacitated person, the court shall set a date for a hearing to determine whether there is probable cause to believe that the respondent committed an act which would be a crime if committed by an adult.” Accordingly, the court held a hearing to determine whether there was probable cause to believe that the respondents committed acts which would be crimes if committed by an adult.
The petitioner called Police Officer Anderson of the 101st Precinct to testify. He stated that on May 10,1981 at approximately 4:45 p.m. he and his partner received a radio run to investigate two youths floating in Jamaica Bay. When they arrived, Police Officer Anderson observed two black youths floating face down at the bottom of the bay in approximately five feet of water. After the bodies were removed from the water, Police Officer Anderson and a Detective Richardson found someone who knew the boys. Subsequently, the father and mother of Furguron E. arrived at the scene and they identified their son and their nephew Jabril B. The bodies were pronounced dead on the scene by the ambulance attendant and were removed to the morgue.
After the petitioner entered the autopsy reports into evidence, Detective Joseph Richardson of the 101st Precinct was called to the witness stand. He first became involved in the case on May 10,1981 at approximately 5:00 p.m. when he received a call regarding two kids seen floating face down in the water.
After Detective Richardson stated that he interviewed the respondents and their mothers on May 13, 1981, counsel for Darwin J. made a motion to suppress any statements given to the witness on the grounds that any statements were not given voluntarily and that Darwin J. was incapable of waiving his Miranda rights. The attorney for Robert G. joined in the motion.
The petitioner argued that the motion was improper at this time as the court was conducting a probable cause hearing where the sole issue was whether it was reason *690 ably likely that the respondents committed a crime and where the sufficiency of any statements did not come into play. The petitioner cited several cases including one that stated “questions concerning the ultimate admissibility of evidence, such as * * * any confession he might have made, are not germane to the purposes of the [probable cause] hearing.” {People ex rel. Pierce v Thomas, 70 Misc 2d 629, 630.)
The court denied the motion of the respondents. The court found that the probable cause hearing does not have to concern itself with questions of admissibility of evidence, such as lawfulness of a search or whether a confession was given under the right conditions. The only issue that a probable cause hearing is concerned with is whether the respondent was likely to have committed a crime and whether there is probable cause that a crime was committed. {People v Staton, 94 Misc 2d 1002; People v Mono, 95 Misc 2d 632; People v Davino, 93 Misc 2d 47.) All other questions concerning the admissibility of evidence are not adjudicated in a probable cause hearing.
Detective Richardson continued his testimony. On May 13, 1981 at the 101st Precinct, he spoke to Robert G. and Darwin J. with reference to this matter. He spoke to Robert G. first with Dorothy G., his mother. Detective Richardson asked Robert if he knew anything about the two kids who drowned in the water. Robert said that he was in the park with his brother and Darwin who found a toy. Darwin told Robert to throw it in the water, which Robert did. Darwin told one of the little kids to get the toy and the boy refused. Robert then said that Darwin pushed one boy in the water and he pushed the second. Robert stated that he put a string in the water to try to reach one kid, but the string was too short so he dropped it and ran.
During Detective Richardson’s conversation with Darwin J., Margaret J., his mother, was present. Darwin stated that he was in the park with Robert and Robert’s brother. Darwin found a toy and Robert threw it in the water. Robert then told one of the kids to get the toy out of the water and the kid refused. Darwin said that Robert pushed the first kid and he pushed the second and then ran home.
*691 Detective Richardson was present when the respondents made statements to the Assistant District Attorney on May 13, 1981 after they had talked to him. The statement made at that time by Robert G. was substantially the same as the statement he made to Detective Richardson earlier. However, Darwin J. said something slightly different. Darwin stated that he pushed the first kid and Robert pushed the second. Then he said that he and Robert pushed the first boy together, the second boy started to run and Robert pushed him in the water. Detective Richardson concluded his testimony by noting that neither Robert nor Darwin denied pushing anyone in the water.
The probable cause hearing in the Family Court is substantially identical to the criminal court preliminary hearing. In a probable cause hearing required under the 1975 amendments for 14-day detention of juveniles, evidentiary standards applicable to the hearing on the felony complaint in criminal court govern. (Matter of Renaldo Q., 83 Misc 2d 945.) The rules of evidence in the two proceedings are the same, and the probable cause standards in the two hearings are identical. (Family Ct Act, § 739, subd [b], par [1]; Matter of Renaldo Q., supra.)
The burden of proof at a probable cause hearing is not stringent. It is not necessary for the petitioner to present a prima facie case in order to meet its burden at a felony hearing. The court’s sole duty at a felony hearing is to determine whether the petitioner has met its burden of showing reasonable cause to believe that a felony was committed and that the respondent committed the crime; it is not the function of the Judge at the felony hearing to decide questions of law. (People v Martinez, 80 Misc 2d 735; People v Dash, 95 Misc 2d 1005.)
The purposes of a preliminary hearing were summarized by the court in Mattioli v Brown (71 Misc 2d 99, 100). The court stated: “A preliminary hearing * * * is, basically, a first screening of the charge; its function is not to try the defendant, nor does it require the same degree of proof or quality of evidence as is necessary for an indictment or for conviction at a trial. The objective is to determine ‘If there is reasonable cause to believe that the defendant committed a felony’. (CPL 180.70.)”
*692 CPL 70.10 (subd 2) provides: ‘“Reasonable cause to believe that a person has committed an offense’ exists when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it.” “Since the quantum of evidence required to hold a person for the Grand Jury is less than that required for an indictment, the Judge at the preliminary hearing may be required to hold a defendant without regard to the probability of a successful prosecution.” (People v Anderson, 74 Misc 2d 415, 418.)
At a preliminary hearing the petitioner’s case need only present a broad outline of the facts. Questions concerning ultimate admissibility of evidence, such as lawfulness of a search of the respondent or of his premises or of any confession he might have made, are not germane to the purposes of a preliminary hearing. While the circumstances surrounding the obtaining of such evidence may eventually be tested, and may lead to its exclusion from trial, those circumstances do not affect the reliability of the evidence as it relates to guilt and are thus irrelevant to a determination that it is reasonably likely that the respondent committed a felony. The same is true of the question whether the seizure of the respondent was a lawful one. The constitutional issues of how evidence was obtained and thus the ultimate admissibility of the evidence are irrelevant at a probable cause hearing. (People ex rel. Pierce v Thomas, supra.)
Under the procedures established by the Legislature in section 748-a of the Family Court, any issues pertaining to a respondent’s mental capacity, including whether he or she had the requisite intent to commit the felonious act, will be determined when and if such respondent’s incapacity ceases and when and if a fact-finding hearing can proceed.
Based on the statutory and case law outlining the limited nature, purpose and scope of a probable cause hearing and the not very strict burden of proof necessary to show probable cause, the court finds that the introduction into *693 evidence at the probable cause hearing of a certified copy of the autopsy report certifying the cause of death of the two deceased children was asphyxia by drowning, and the testimony of Detective Joseph Richardson that both respondents each admitted pushing the two deceased children into the water, which resulted in their deaths by drowning, are sufficient to establish probable cause to believe that respondents Robert G. and Darwin J. committed acts which if committed by adults would be felonies as charged.
So ordered.
Dispositional hearing pursuant to section 748-a will be heard on June 7, 1983.