■ In the Matter of BONNIE MICHELLE W., a Person Alleged to be a Runaway, Appellant.—Order, Family Court, New York County, entered on December 17, 1979, which denied appellant's motion to dismiss the petition for lack of jurisdiction and provided that a Bench warrant be issued for appellant, reversed, on the law, motion to dismiss granted and Bench warrant vacated, without costs. Appellant, born on January 13, 1963, was arrested on September 17, 1979 by a Port Authority police officer, on suspicion of being a runaway. She was brought to Family Court, New York County, the next day, and a petition was drawn charging her with absconding from her home in Pennsylvania. This Family Court proceeding was continued several times in order to give appellant's father and stepmother opportunity to obtain the required interstate compact requisition for the return of their daughter. On November 5, 1979, the Family Court received, and marked in evidence, an order of the Pennsylvania Court of Common Pleas, dated October 9, 1979, dismissing appellant's stepmother's application for an interstate compact requisition. The proceeding was again adjourned, over objection, to permit a reapplication for the requisition and appellant was continued in detention. On November 19, 1979, it was reported to the court that appellant had absconded and also that her stepmother had decided not to reapply for a requisition, thus letting stand the Pennsylvania court's dismissal of the proceedings. Appellant's counsel renewed her previous application to dismiss the petition for lack of jurisdiction. The Family Court denied the motion and issued a warrant for appellant, "for determination as to whether or not she should be placed with the Commissioner as a destitute person". The return of runaways is governed by the Interstate Compact on Juveniles (L 1955, ch 155, § 1), article 4 of which states, in part, as follows: "(a) That the parent * * * of a juvenile who has not been adjudged delinquent but who has run away without the consent of such parent * * * may petition the appropriate court in the demanding state for the issuance of a requisition for his return * * * If the judge [of the demanding State] determines * * * that the juvenile should be returned, he shall present to the appropriate court * * * of the state where the juvenile is alleged to be located a written requisition for the return of such juvenile * * * Upon reasonable information that a person is a juvenile who has run away from another state party to this compact without the consent of a parent * * * such juvenile may be taken into custody without a requisition and brought forthwith before a judge of the appropriate court who may appoint counselor guardian ad litem for such juvenile and who shall determine after a hearing whether sufficient cause exists to hold the person, subject to the order of the court, for his own protection and welfare, for such a time not exceeding ninety days as will enable his return to another state party to this compact pursuant to a requisition for his return from a court of that state." The requirement in the Interstate Compact on Juveniles of a formal requisition from the demanding State to the retaining

State for the return of a runaway is mandatory and, therefore, upon the dismissal by the Pennsylvania court of the application for a requisition, the Family Court was ousted of jurisdiction. Nor was jurisdiction obtained by the Family Court over appellant, who was over the age of 16, based upon its speculation as to her supposed "destitute status" or as a person in need of supervision (see *Matter of Patricia A.,* 31 NY2d 83). While we are sympathetic to the court's concern for the welfare of the appellant, the Family Court is a court of limited jurisdiction. It has only such jurisdiction and powers as the Constitution and the laws of the State expressly grant it. (NY Const, art VI, § 13; *Matter of Borkowski v Borkowski,* 38 AD2d 752.) Concur —Sandler, J. P., Sullivan and Carro, JJ.

Lupiano, J., dissents in a memorandum as follows: On August 20, 1979, Bonnie Michelle W. (hereinafter Bonnie), then 16 years of age, absconded from her home in Charleroi, Pennsylvania. On September 17, 1979, she was observed by Port Authority police at the Port Authority Bus Terminal to be shabbily dressed and acting in a manner which led them to believe that she was a runaway. They took her into custody and, after spending the night in Spofford Juvenile Center (a secure detention facility), she was taken, on September 18, 1979, to the Family Court, New York County. Upon ascertaining that Bonnie was a runaway and that her stepmother intended to file a requisition for Bonnie's return pursuant to Interstate Compact on Juveniles (see L 1955, ch 155, § 1) a petition was drawn which alleged that Bonnie had absconded from her Pennsylvania home on August 20, 1979. At the statutorily mandated hearing on September 21, 1979, it also appeared that Bonnie had a history of 11 prior endeavors to abscond. The Family Court determined that sufficient cause existed to hold Bonnie "for her own protection and safety and welfare for a time not to exceed 90 days * * * pursuant to the Interstate Compact" and remanded her to the custody of the Commissioner of Juvenile Justice for detention in a secure facility. The record discloses that Bonnie's Law Guardian, Legal Aid, ably represented Bonnie at this hearing, but viewed the "best interest of the child" criterion only in terms of Bonnie's desire not to return to Pennsylvania. At the continuation of the hearing on September 26, 1979, it was disclosed that Bonnie's stepmother was a diabetic. Brief questioning of Bonnie by the Family Court Judge was frustrated in large measure by the Law Guardian's counseling Bonnie not to answer. Understandably, the Judge expressed discomfiture in that he had to determine in the child Bonnie's best interest whether to continue her custody in a secure or nonsecure facility, when she was not permitted by her counsel to say anything. This conduct resulted in the following colloquy: "The Court: I'm interested in knowing whether she's been in non-secure before, and run from them in New York. Legal Aid: Judge, this is the first time that [Bonnie] has been in New York. She has never been in a non-secure facility. She's never had the opportunity to run from a non-secure facility. She assures me that she would not run from such a facility. The Court: You see what it amounts to [Bonnie]. You and I are going to be dealing with each other. We don't have children under 18 years of age going from state to state *without anybody being responsible* for them. It's not because anybody thinks that parents are always right. It's because somebody has to be * * * responsible for you. And there are some rules about being in school, and they are different in different states. If you do run, you will be picked up again, and you will never be trusted * * * I think your lawyer is correct, that we should try to put you in a non-secure facility if you are not going to run away * * * Do you understand? Bonnie: Yeah. The Court: Very often young people your age would come to the City of New

York from other states because they don't have any parents or relatives here to assist them, and they get assistance from people who are not always very good for them. I'm interested in knowing whether you have found any affiliations here in New York that you feel you will have to run to because they were good to you. Talk to your lawyer first, and see if she wants you to answer that question * * * Bonnie: Yeah. I have a fiance in New York City. He lives in Jersey City, but he hangs around in New York, Manhattan. I would abide by any rules * * * I won't try to take off. The Court: How old is your fiance? Bonnie: 21. The Court: Have you been able to communicate with him since you've been in Juvenile Center? Bonnie: I [wrote a letter]. He probably got it." Despite the statement from the Assistant Corporation Counsel (in support of the petition) that he had evidence that Bonnie had run away several times before from another facility (apparently in Pennsylvania), it was determined that Bonnie be remanded to nonsecure detention on condition she not communicate with her male friend in New Jersey. Legal Aid objected to the condition. The court responded: "She's 16 years old. Why don't you go over this [addressed to the Law Guardian representing Bonnie]. Now look [Bonnie], I'm sending you to non-secure detention. I'm asking you to act like an adult for a short period." The Law Guardian, Legal Aid, again voiced objection to the condition, citing the infant's constitutional right of free association. The court responded: "I have an absolute responsibility for this child's safety. This is not an unsophisticated Court. This Court has worked very closely with Father Ritter and Under 21. I'm not unaware of the crash pads on 42nd Street, and I'm not getting involved with this until I know more about this case." Accordingly, as it appeared that Bonnie's stepmother, a diabetic, was unable to assist her Pennsylvania Legal Aid attorney in preparing the requisition papers by September 26, 1979, because she had been in the hospital in intensive care, the matter was adjourned to October 3, 1979, and Bonnie was placed in nonsecure detention. On October 3, 1979, the court was informed by the foster mother and the social worker involved with Bonnie, that she was doing well, having found employment, but that some difficulty was being encountered in enrolling Bonnie in school. Legal Aid, Bonnie's Law Guardian, informed the court that the stepmother's attorney filed a petition in the Juvenile Part of the Pennsylvania Family Court. Bonnie's remand to nonsecure detention was continued. Bonnie was present at this hearing. At the adjourned date of the hearing, October 5, 1979, the court was informed that Bonnie absconded from the nonsecure detention, the same day on which the prior hearing was held, to wit, October 3, 1979. Bonnie's Law Guardian requested that the petition be dismissed or, in the alternative, that if a warrant is issued, the court mark it a "stayed warrant" to afford the Law Guardian the opportunity to have Bonnie voluntarily return. The court issued a "straight" warrant. On October 9, 1979, while Bonnie was still "at large," the Juvenile Division of the Pennsylvania Court of Common Pleas denied the stepmother's application, without prejudice, for a requisition under the Interstate Compact on Juveniles (L 1955, ch 155, § 1) "based upon the representations to the Court that Bonnie * * * is in New York City and that she does not desire to return, and *because she is presently in the custody of the Juvenile Authorities, and that* due to the precarious nature of the physical condition of the step-mother, *the step-mother is unable to take custody* or to care for the child" (emphasis supplied). It is important to note at this point that the Pennsylvania court did not operate in a vacuum regarding the custody status of the infant, but denied the application by the stepmother because she was then not physically able to take custody, but custody did exist with

the New York authorities, i.e., they were then responsible for the infant's welfare. On November 15, 1979, the next adjourned date of the hearing, Bonnie having been apprehended, the Law Guardian informed the court that her client, Bonnie, had informed her (the Law Guardian) that she had two conversations with her stepmother in which the stepmother purportedly stated that she did not care whether Bonnie returned. Again, the Law Guardian moved to dismiss the petition. The court, solicitous for the best interest of the child, was informed, by the Family Court liaison officer, that a telephone inquiry to Bonnie's stepmother disclosed that she was adamant about having Bonnie returned. However, the stepmother's attorney had left the Legal Aid agency where he worked without taking any further action with respect to a second requisition. Pennsylvania Legal Aid informed the New York Family Court liaison officer that the case was marked closed because of Bonnie's absconding while in New York custody, but that they would ascertain whether to renew the stepmother's application. The Probation Department, in light of Bonnie's history of running away, recommended remand to secure detention, in which the Corporation Counsel concurred and to which the Law Guardian objected. Bonnie was remanded overnight to secure detention. On November 16, 1979, at the continued hearing, the Law Guardian again objected to the secure detention of Bonnie at Spofford on the ground that Spofford is a facility where delinquent children are housed and that Bonnie, being simply a runaway, the facility was inappropriate under the Interstate Compact on Juveniles statute. Further, the Law Guardian submitted to the court that Bonnie had absconded from the nonsecure detention because of the influence of another girl who was placed in such detention at the same time. (Parenthetically, the reasonable corollary of this contention, if true, is that Bonnie is, in fact, easily susceptible to external influences from individuals not necessarily having her best interests at heart, and in view of her express promise to the court, is guilty of exhibiting a marked lack of maturity and self-control.) The Law Guardian, not having satisfactorily demonstrated to the court that the Spofford detention facility is a proscribed facility for detention under the Interstate Compact on Juveniles (L 1955, ch 155)[1] the court remanded Bonnie to the Commissioner of Juvenile Justice with no recommendation as to whether the infant was to be placed in secure or nonsecure detention, the responsibility for such placement being specifically cast by the court upon the commissioner. On Monday, November 19, 1979, the next adjourned date of the hearing, the court was informed that Pennsylvania Legal Aid conveyed information to the effect that the stepmother would not renew her petition in Pennsylvania because Bonnie had called her the previous Saturday night and threatened her if she persisted in seeking the return of Bonnie. Bonnie had absconded (for the second time in New York) from a nonsecure detention facility on Saturday morning, having been theretofore placed in such facility the night before. The Family Court Judge declared that he was going to issue a warrant to bring Bonnie back for determination as to whether or not she should be placed with the Commissioner "as a destitute person." The Law Guardian objected, stating that as the stepmother does not intend to file a requisition in Pennsylvania, the New York

---

1. Article 9 of the compact (L 1955, ch 155, § 1) entitled "Detention Practices" states: "That, to every extent possible, it shall be the policy of states party to this compact that no juvenile or delinquent juvenile shall be placed or detained in any prison, jail or lockup nor be detained or transported in association with criminal, vicious or dissolute persons."

Family Court automatically lost jurisdiction over Bonnie. The court responded: "I don't believe it would be for *this young lady's best interest* that the authority of the court for the State of New York be flouted by her absconding, and I think that *as parens patriae to a young lady born on January 13, 1963,* that this court at least should have her brought here with a view towards enlisting the aid of the Department of Social Services if she is, in fact, a destitute child. I am going to issue a warrant for that purpose. That is all" (emphasis supplied). Study of the record discloses, therefore, that invocation of the best interest of the child rule sought to be scrupulously observed by the Family Court was specifically and directly addressed by the Law Guardian in only one instance throughout the various dates on which the hearing was held and then only in the context of what was personally desired by the child herself. While an infant at common law means any person who has not reached the age of 21 years, the statutory directives in New York now set the age limit at 18 years (see 28 NY Jur, Infants, §§ 1, 2; General Obligations Law, § 1-202; Domestic Relations Law, § 2). Patently, Bonnie was at all times in the period delineated above an unemancipated minor. "It is the policy of the law to look after the interests of infants *incapable of looking after their own affairs,* to *protect them from their own folly* and improvidence, and *to prevent adults from taking advantage of them.* From birth an infant is considered to be a ward of the state, the state standing in relation of parens patriae to infants and being *vitally concerned with their welfare.* The authority of the state as parens patriae to infants covers a wide field, including such subjects as the custody and education of infants, the care, supervision, and disposition of delinquent, neglected, and dependent children, the conditions of employment of infants, and the substitution of others in the place of the natural parents by adoption or the appointment of a guardian. It is also frequently stated that *infants are wards of the court,* the court representing the state * * * However, the court is powerless to protect the interests of an infant unless and until jurisdiction of the infant is properly acquired" (28 NY Jur, Infants, § 3; emphasis supplied). It is beyond cavil on the record herein that jurisdiction of Bonnie was properly acquired by the Family Court. Subdivision (a) of article 4 of the Interstate Compact on Juveniles (L 1955, ch 155, § 1) states in pertinent part: "Upon reasonable information that a person is a juvenile who has run away from another state party to this compact without the consent of a parent, guardian, person or agency entitled to his legal custody, such juvenile may be taken into custody without a requisition and brought forthwith before a judge of the appropriate court who may appoint counsel or guardian ad litem for such juvenile and who shall determine after a hearing whether sufficient cause exists to hold the person, subject to the order of the court, *for his own protection and welfare,* for such a time not exceeding ninety days as will enable his return to another state party to this compact pursuant to a requisition for his return from a court of that state" (emphasis supplied). The statute (Interstate Compact on Juveniles) does not operate in a legislative or judicial vacuum. For example, assuming the State from whom the juvenile has run away seeks his return, the State where the juvenile was found may nevertheless retain custody if there is pending any criminal charge or juvenile delinquency proceeding against the juvenile or if he is merely *suspected* of having committed in such State a criminal offense or an act of juvenile delinquency (Interstate Compact on Juveniles, L 1955, ch 155, art 4, subd [a]). Indeed, "all remedies and procedures provided by [the] compact shall be *in addition to and not in substitution for* other rights, remedies and procedures, and shall not be in

derogation of parental rights and responsibilities" (L 1955, ch 155, § 1, art 2; emphasis supplied). The critical issue on this appeal is directed not at the propriety or legality of Bonnie's initial apprehension as a runaway and the jurisdiction vested in the Family Court over her person in consequence thereof, but what is the proper procedure when a requisition does not, in fact, issue after a minor has been lawfully detained pending its arrival. The Interstate Compact on Juveniles makes no specific provision for such an eventuality. Elucidation as to the proper manner of resolving this issue may be gleaned from article 1 entitled "Findings and Purposes" of the Interstate Compact on Juveniles (L 1955, ch 155, § 1, art 1). First, it states "That *juveniles who are not under proper supervision* and control, *or who have* absconded, escaped or *run away, are likely to endanger their own* health, morals and welfare, *and the health, morals and welfare of others"* (emphasis supplied). Clearly, infants who run away from the parental abode in sister States and flock to the lure of the Big Apple are likely to pose a danger to themselves and to others in terms of health, morals and welfare. Our newspapers have had more than one occasion to describe the personal misery and anguish, the danger to society and the chagrin of our vaunted western civilization in the servitude of these misguided youths to the minions of prostitution. Indeed, one particular area of our city in proximity to the Port Authority Bus Terminal notorious for the impressment into the life of prostitution of destitute young people who have run away or been abandoned by their parents and in some, if not total, measure by society, has received the appellation—the Minnesota Strip. The Family Court Judge herein, not blinded by the abstraction of the law, but sensitive to the responsibility vested in the court as *parens patriae* of the minor, Bonnie, and aware of the reality of the streets, sought to validate the best interests of the child concept by issuing the order which provided that a Bench warrant be issued for Bonnie. In so doing, he concomitantly endeavored to vindicate the spirit of the Interstate Compact on Juveniles. To reiterate, the compact is not to be viewed in isolation from the body of the law of this State as it relates to the health, morals and welfare of minors. In clear and unequivocal terms, the compact declares that each State "In carrying out the provisions of this compact * * * shall be guided by the non-criminal, reformative and protective policies which guide their laws concerning delinquent, neglected or dependent juveniles generally" (L 1955, ch 155, § 1, art 1). It is assumed for purpose of this analysis that the minor Bonnie is not a delinquent juvenile. The Law Guardian for Bonnie urges that since she is not a delinquent and since a requisition was apparently not forthcoming from the State of Pennsylvania, *ipso facto,* the Family Court lost subject matter jurisdiction over Bonnie. In skillfully representing Bonnie before the Family Court, the Law Guardian appears to have regarded Bonnie as, in effect, an adult client, i.e., a matured individual. However, Bonnie emerges from the pages of the record before us not as a matured individual, but as a juvenile who has behaved irresponsibly, appears to be very impressionable, and entered this State in a destitute condition. In this connection, we are mindful of the edict that "The provisions of [the Interstate Compact on Juveniles] shall be *reasonably and liberally* construed to accomplish [its] purposes" (L 1955, ch 155, § 1, art 1; emphasis supplied). The administration of the compact in New York rests with the Director, Division for Youth, within the executive branch of government. In lieu of promulgating its own rules and regulations to carry out the terms and provisions of the compact, New York has applied the Juvenile Compact Procedure Manual adopted by the Council of State Governments in 1976. Subdivision 4 of section 504.1 of

the Juvenile Compact Procedure Manual provides in pertinent part: "In the ordinary course of events, it is presumed that when the child has been found and detained in the asylum state the parents at home will initiate the petition for the child's return. If the parents show no such interest in seeking the return of the child, it would then be in order for the appropriate court at home (and interested public officials) to undertake a proceeding which would place custody of the child in someone else's hands if a review of the facts indicates that action is *in the best interests of the child.* The basic Compact does not require the home state to remove its runaways but it was agreed at the Seventh Annual Meeting that the spirit of the Compact indicates that this should be done" (emphasis supplied). Obviously, if the mere fact that a requisition was not forthcoming from the home State of a runaway would serve to automatically deprive the court of the asylum State which had theretofore obtained jurisdiction over the infant, of that jurisdiction, there would be no opportunity for the compact States involved (in this case Pennsylvania and New York) to undertake a proceeding to place custody of the child in someone else's hands if warranted in the best interests of the infant. Patently, the Juvenile Compact Procedure Manual is imbued with the realization that the best interests of the child must be effectively served. To this end, it is recognized that the failure of the parent(s) of the runaway child (entitled to custody of the child) to apply for a requisition for the return of the child, or to obtain such requisition because the court of the home State finds the parent(s) to be unfit to retain such custody, creates a void in the custody of the child. The void must be filled under appropriate circumstances consonant with constitutionally permissible procedures by the State in its capacity as *parens patriae,* otherwise the best interests of the child tenet becomes a vacuous abstraction, to which only "lip service" is rendered. On the issue of continuing jurisdiction, it is noted that the juvenile may be taken into custody *without* a requisition and that due process is afforded by the provision for a hearing to determine whether *sufficient cause exists to hold the juvenile, for his or her own protection and welfare,* for a time not exceeding 90 days, during which period the court of the home State may act to obtain return of the juvenile. Upon return, the juvenile is still "subject to such further proceedings as may be appropriate under the laws of [the home] state" (Interstate Compact on Juveniles, L 1955, ch 155, art 4, § 1, entitled "Return of Runaways'). During this 90-day period in which the juvenile was being held for her own protection and welfare, the home State, having refused the petition by the stepmother as one entitled to custody of the infant because she was not fit in a physical sense to exercise that custody, was entitled to and it might be urged had an inchoate obligation to obtain such custody in place of the parent if required to vindicate the best interests of the child. No investigation was undertaken or procedures utilized by the Pennsylvania authorities to explore the present circumstances of the infant Bonnie, i.e., to ascertain whether she was destitute, neglected and needful of the solicitude of her home State in its role as *parens patriae.* The spirit of the Interstate Compact on Juveniles mandates that upon such default by the home State in fulfilling the obligation of *parens patriae* as required by the best interests of the child, the asylum State succeeds to that function. This mandate proceeds from the requirement that the asylum State shall be guided by its policies and laws concerning delinquent, neglected or dependent juveniles, that responsibility for the care of juveniles not be left in limbo because of nonaction on the part of the home State and from the fact that the compact is in addition to and not in substitution for other remedies and procedures,

and is not in derogation of accepted principles governing custody and care for the child when the parent will not or cannot exercise parental rights and responsibilities (see Interstate Compact on Juveniles, L 1955, ch 155, arts 1, 2). Accordingly, as requisition for custody of the juvenile was not forthcoming from the parents or the home State (Pennsylvania) and during the term of the 90-day period, the asylum State (New York) endeavored to implement the spirit of the compact by affording to the minor, who was represented by a Law Guardian, protection and aid as required by the best interest of the child. Subdivision (f) of section 1012 of the Family Court Act defines, in pertinent part, a "neglected child" as a "child less than 18 years of age (i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care * * * (B) in providing the child with proper supervision or guardianship * * *; or (ii) who has been abandoned by his parents or other person legally responsible for his care." In the absence of a requisition for a runaway child from the parent(s) of such child or from the person (private or public, including the home State) otherwise legally responsible for caring for such child, it may be that the child requires the aid of the court. Such a child may well be, in effect, abandoned or deserted. Jurisdiction is vested in the Family Court over proceedings involving a neglected child (Family Ct Act, § 115, subd [a], par [i]). The liberality of the State's endeavor to aid destitute and neglected children is perceived in its statutory enactments, as, for example, the fact that "In defining the term 'neglected child' under the Family Court Act, the legislature has amplified the classical meaning of neglect so as to include, among other things, moral neglect" (15 NY Jur, Domestic Relations, § 433). Section 255 of the Family Court Act imposes the duty on the Family Court Judge to obtain assistance and co-operation from any public authority or employee thereof in the State as may be required to further the objects of the Family Court Act concerning a child who is under the court's care or custody. Said section states, *inter alia,* that "The court is authorized to seek the cooperation of, and may use * * * the services of all * * * organizations, public or private, *having for their object the protection or aid of children* * * * to the end that the court may be assisted in every reasonable way *to give the children* * * * *within its jurisdiction such care, protection and assistance as will best enhance their welfare"* (emphasis supplied). Section 371 of the Social Services Law defines a "destitute child" (subd 3) as one "actually or apparently under the age of eighteen years" (subd 1) "who, through no neglect on the part of its parent, guardian or custodian, is (a) destitute or homeless, or (b) in a state of want or suffering due to lack of sufficient food, clothing, or shelter * * * or (c) a person under the age of eighteen years who is absent from his legal residence without the consent of his parent, legal guardian or custodian, or (d) a person under the age of eighteen who is without a place of shelter where supervision and care are available." Pursuant to subdivision 1 of section 398 of the Social Services Law, the State and city public welfare officers have the power and the duty to "Assume charge of and provide support for any destitute child who cannot be properly cared for in his home." Under the panoply of legislative enactments enunciated above and their kindred statutes, it is clear that the Family Court having obtained in personam jurisdiction over the child Bonnie, also had subject matter jurisdiction to deal with her both as a runaway and as a destitute or neglected child. Simply put, the fact that a child is a runaway does not exclude consideration that such child may be destitute or neglected or both

destitute and neglected. Granted that Bonnie was initially confronted by the Family Court because she occupied the status of a runaway, consideration of what is in her best interest *as a child* is not limited to such status, but may and indeed must embrace all relevant circumstances surrounding the child. From this commonsense observation it follows that it is inconceivable that the Legislature intended to turn a runaway minor loose on the streets of New York if such action was not in the best interests of the minor simply because no requisition was forthcoming. Yet this is the result argued for by the minor's Law Guardian and adopted by the majority herein. The New York Constitution provides that the Family Court shall have subject matter jurisdiction over, *inter alia,* the following classes of actions and proceedings: "(1) the protection, treatment, correction and commitment of those minors *who are in need of the exercise of the authority of the court* because of circumstances of neglect, delinquency or dependency, as the legislature may determine; (2) the custody of minors except for custody incidental to actions and proceedings for marital separation, divorce, annulment of marriage and dissolution of marriage" (NY Const, art VI, § 13, subd b). The Family Court Judge in ordering the issuance of the warrant herein did so because the circumstances clearly indicated that the child Bonnie might be and most likely is in need of the exercise of the authority of the court. In *People ex rel. Wayburn v Schupf* (39 NY2d 682, 690) the Court of Appeals aptly recognized that "The children who come before Family Court fall largely into two categories—those who are no longer subject to the guidance or effective control of their parents or guardians, and those who have no custodians at all. Indeed this is what has contributed to their difficulties. In this circumstance to a very real extent Family Court must exercise a substitute parental control for which there can be no particularized criteria." In essaying to explore the circumstances surrounding Bonnie, i.e., to obtain relevant information upon which to predicate an informed determination as to her future status, her welfare and her needs and as a means of protecting the child, the Family Court issued the order providing that a Bench warrant be issued to bring Bonnie before the court. Bonnie has a legitimate interest in her liberty, but such interest is not absolute in and of itself but exists in relation to her entitlement, her right to protection and guidance in her growing years and in context with the interest of society in its own protection. Confronted with this mosaic of interrelated rights and interests, the delicate art of reconciliation has devolved pursuant to the State Constitution and legislative enactment in large measure on the Family Court. "This case draws attention to what appears to be a growing tragedy—the thus far elusive and largely unmanageable problem of the [destitute] neglected [or] delinquent child in our society. Most important— intelligent, effective and compassionate means must be found to assist children that are not subject to parental guidance or control, or whose custodians are ineffectual, through the temptations and turbulence of adolescence. In this aspect the children are the victims" *(People ex rel. Wayburn v Schupf, supra,* p 690). In fashioning a remedy, the Family Court quite properly utilized the inherent power vouchsafed by its role as *parens patriae* to the minor. "The rationale of this policy is that: 'the State must intervene in order to protect an individual who is not able to make decisions in his own best interest. The decision to exercise the power of *parens patriae* must reflect the welfare of society, as a whole, but mainly it must balance the individual's right to be free from interference against the individual's need to be treated, if treatment would in fact be in his best interest. Because of the variables, the question of whether this power should

be exercised in a given situation is quite difficult * * *" *(Matter of Weberlist,* 79 Misc 2d 753, 756.) It is apparent that the court has the inherent power to fashion an adequate remedy in effectuating this policy" *(People ex rel. Thorpe v Clark,* 62 AD2d 216, 228-229). Similarly, the female minor's need to be protected, guided and supported must be balanced against her right to be free from interference, if such protection, guidance and support would, in fact, be in her best interest. Clearly, Bonnie is beyond the effective control of her parents and in the absence of State action by the Pennsylvania authorities is, in effect, beyond effective control by the State of Pennsylvania. The onus of control has *de facto* devolved on the New York authorities. To repeat, Bonnie came before the Family Court as a runaway *child* and has not exhibited in any fashion the maturity associated with the adult state. "It is true that the State does not exercise control over adults in comparable respects * * * However, despite the new equation of children with adults with respect to some rights, the eternal verity of the child's biological and psychological differences—[her] immaturity and plasticity—continues to evoke many different legal restrictions as well as privileges for the child. And, while 'the condition of being a [young girl] does not justify a kangaroo court' *(Matter of Gault,* 387 U. S. 1, 28), the condition of being a [young girl] *does* entail dependence on the part of the child and a reciprocal responsibility on the part of the adults. Adult responsibility, falling initially upon the parent, is recognized in a complex of legal duties, rights, and powers. Thus, the parent has a duty of financial support (Family Ct. Act, art. 4) as well as the right and power to discipline, the Penal Law providing: 'A parent * * * entrusted with the care and supervision of a minor * * * may use physical force * * * upon such minor * * * when and to the extent that he reasonably believes it necessary to maintain discipline or to promote the welfare of such minor' (Penal Law, § 35.10). While the doctrine of *parens patriae* does not permit any unfairness in judicial procedure towards juveniles *(Matter of Gault,* 387 U. S. 1, *supra)* * * * the vitality of that doctrine continues in that the State has the power to perform the parental role of insuring the child's * * * training [to which we add protection and support], when the parent is unable to control [her] sufficiently to perform it. If children were permitted the same freedom of choice as adults, they might well be unequipped when they attain adulthood to exercise *any* freedom of choice" *(Matter of Mario,* 65 Misc 2d 708, 717). Bonnie was taken into custody, having run away from her Pennsylvania home, at a time when she was roaming through the Port Authority Bus Terminal in an apparent destitute condition. Despite the brief interval between her absconding from her home and her being taken into custody in New York, she avers that she acquired a "fiance" within a few weeks of her arrival here. It would be remiss for the court not to be concerned under such circumstances with Bonnie's becoming dependent on potentially destructive persons in order to support herself. Section 141 of the Family Court Act in relevant part states: "This act defines the conditions on which the family court may intervene *in the life of a child,* parent and spouse. *Once these conditions are satisfied,* the court is given a *wide* range of powers for dealing with the complexities of family life so that its action may fit the *particular needs* of those before it. The judges of the court are thus given a wide discretion and grave responsibilities" (emphasis supplied). Accordingly, under the principle of continuing jurisdiction and having due regard for the *parens patriae* role of the Family Court, it is clear that the minor Bonnie was subject to the jurisdiction of the Family Court and its endeavor to afford her access to assistance and support with regard to the legislatively mandated duty of the Department of Social

Services to provide aid to runaway children under 18 years of age. There is no diminution in Bonnie's right to such assistance and protection because she is a runaway from an out-of-State home rather than a runaway from a home in New York. The only distinction in law arising from the fact that she absconded from an out-of-State home as contrasted with absconding from a home in New York is that she also passed within the aegis of Interstate Compact on Juveniles.[2] She did not thereby forego her entitlement to the benefits of this State's public policy to protect and assist runaway youths and to afford them shelter and counseling services. The interrelation of the Runaway and Homeless Youth Act of Nineteen Hundred Seventy-Eight (Executive Law, §§ 532-532-d) to article 10 of the Family Court Act is significant. Article 10 of the Family Court Act entitled "Child Protective Proceedings" is referred to in the popular press as the "Childrens' Bill of Rights." Its purpose is "to establish procedures to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being. It is designed to provide a due process of law for determining when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met" (Family Ct Act, § 1011). Of course, in the case of Bonnie, the wishes of a parent (her stepmother) were disregarded by the Pennsylvania court because of its finding that the stepmother was physically unable to care for Bonnie. Under the concept of *continuing jurisdiction* inherent in the Interstate Compact on Juveniles (see, especially, L 1955, ch 155, § 1, arts 1, 2, 4, subd [a]), the critical gravamen of jurisdiction is the status of the juvenile as one who has absconded, escaped or run away. There is no legislative prohibition, no principle of law, no indicia of public policy constraining the Family Court of New York as a court of an asylum State under the compact from investigating, ascertaining and declaring upon the need for protection, support, counseling and aid in general existing on the part of the runaway juvenile, providing jurisdiction properly initially attached with respect to the juvenile. As a corollary the Family Court, acting in the best interests of the child, despite the apparent presumed lack of a requisition from the home State, could evaluate the child's condition and needs and, upon appropriate circumstances demonstrating that the child is destitute and in need of protection and assistance, could request that the authorities of the home State undertake to fulfill their obligation to provide for the welfare and protection of the child and to this end undertake themselves steps to requisition the juvenile. This procedure comports with the public policy of New York State, with the interstate compact, with the doctrine of *parens patriae,* with reason and with common sense. This is in

---

2. In enacting article 19-H of the Executive Law entitled "Runaway and Homeless Youth Act of Nineteen Hundred Seventy-Eight", "The legislature hereby finds and declares that juveniles are running away from home at alarming rates. Runaway youth are without protection and the ordinary means of support, exposed to unnecessary danger and become victims of various illicit businesses which prey upon their vulnerability. This act is designed to establish procedures and services to help protect runaway youth and to alleviate the personal or family situations which present a threat to the health or safety of the youth * * * The policy of this state is to provide assistance to such persons * * *The legislature further recognizes, that because of their age and situation, runaway youth are urgently in need of temporary shelter and counseling services. Therefore, it is * * * the purpose of this act * * * to provide appropriate services to help runaway youth cope with their problems" (Legislative Declaration and Purpose, L 1978, ch 722, § 1).

part the goal sought to be obtained by the Family Court herein. The other aspect of the goal sought to be obtained is, upon ascertaining that the best interest of the child requires intervention by the court to aid and protect her in compliance with due process, and the failure of the home State to exercise its responsibilities to the juvenile under such circumstances, to afford to the infant the aid and protection of the asylum State. Again, no legislative mandate, policy consideration or legal imperative requires that New York as the asylum State discriminate against the juvenile by withholding its aid and protection simply because of the void in custody under the *parens patriae* doctrine occasioned by the failure of the home State to fulfill its obligation to the juvenile. To so hold, as does the majority herein, is to frustrate the clear public policy of New York, to be overly restrictive in construing the interstate compact and to, in effect, perpetuate the victimization of runaway youth confronted with the reality of street life and not the comforting world of legal abstraction. Contrary to the argument of the Law Guardian, the Family Court did not substitute a cause of action alleging the juvenile to be destitute for the cause of action set forth in the petition herein alleging her to be a runaway. The petition is entitled "Runaway" in bold print and it is as a runaway minor that Bonnie confronts the courts of this State. However, the fact that Bonnie is a runaway is only the beginning of the court's legitimate inquiry into the facts and circumstances surrounding her absconding from home and her present status. The need to determine whether in consequence of being a runaway Bonnie is destitute, neglected, abused or in some other viable and vital fashion in need of support, protection and guidance is self-evident. One must be careful of wearing legal "blinders" and exalting form over substance, especially where the party before the court is a minor. To his credit the Family Court Judge herein exhibited a keen humanitarian sensitivity to the plight of Bonnie and attempted not to pay "lip service" to the public policy of New York requiring the succor of homeless and runaway youths, but to essay an exploration of relevant circumstances and to thereby fashion a remedy that comports with such public policy and with the demands of due process. Addressed in this fashion, the issue presented herein acquired vital significance in terms of guidance to the Bench and Bar and public importance. It matters not, in this limited context, whether Bonnie is in reality a fit subject for the beneficence sought to be bestowed. That reality will be determined upon a more complete record should Bonnie be brought before the Family Court in consequence of the outstanding warrant. What matters is the clarification, the precedential value of the determination herein, as it affects the welfare of the numerous out-of-State runaways daily entering this State and the welfare of society as a whole. Mindful of this pre-eminent consideration, I have engaged in the detailed exegesis set forth herein.[3]

---

3. The propriety of entertaining this appeal taken by Bonnie's Law Guardian is, perhaps, open to question because of the fact that Bonnie has absconded from her lawfully-ordered placement, is at large, and is, therefore, not presently available to obey a court mandate (see, e.g., *People v Parmaklides,* 38 NY2d 1005). Such issue need not be addressed, however, because even assuming that under such circumstances the court would dismiss the appeal, the jurisprudential considerations patently militate otherwise (see, e.g., *People v Smith,* 44 NY2d 613, 617 wherein the Court of Appeals stated: "The situation here is analogous to those of mootness or standing, where appeals are determined because the issue presented is imbued with substantial public interest, is surrounded with some uncertainty and is likely to surface again").

Further, in the absence of specific provision in the Interstate Compact on Juveniles and the Juvenile Compact Procedure Manual as to the procedures to be employed with respect to children who abscond from lawful placement in the asylum State pending ultimate disposition of proceeding(s) related to the compact, the provisions of the Family Court Act relating to children who abscond from placements under article 7 of the Family Court Act may be utilized as such absconding presents an analogous situation (see, e.g., Family Ct Act, § 718, entitled "Return of runaway"). Section 778 of the Family Court Act states that when a juvenile placed in the custody of a suitable institution absconds therefrom without permission, and the court, after hearing, determines that the absconding was without just cause, "the court may revoke the order of placement and proceed to make any order that might have been made at the time the order of placement was made". The last order of placement affecting Bonnie was made November 16, 1979, after the Family Court was alerted to the fact that most likely a request for requisition was forthcoming. As Bonnie was in lawful detention at that time pursuant to the compact and if, at that time, she had been absent, patently the court would have authority to issue a warrant for her return pursuant to sections 153 and 153-a of the Family Court Act.[4] Parenthetically, it might well be argued that there is a more acute need for the court to uphold its authority with respect to a minor who has chosen to flout such authority. To fail in at least undertaking steps to secure Bonnie's return to explain her conduct undertaken by her while she was properly in custody and in violation of her promise, is clearly conclusive to fostering in this impressionable and apparently immature young person a contempt for law—an attitude inimical to her own best interest and the interest of society. Awareness and acknowledgment of responsibility for one's conduct is the key to the meaning of life's experience. Relevant to this observation, the suspicion that Bonnie's stepmother's endeavor to fulfill her parental and custodial obligation by reinstituting a request in Pennsylvania for Bonnie's return, was frustrated by virtue of duress—Bonnie's purported threat to harm her physically impaired parent, lends a peculiar urgency to the Family Court's effort at fulfilling its *parens patriae* role. It ill comports with justice and reason, to argue that the judicial machinery and the proper exercise of the majesty of the State having due regard for the legitimate concurrent interests of Bonnie and society, may be so easily thwarted and rendered useless by the unilateral action of the child. The warrant issued by the Family Court is clearly a Family Court warrant and *not* a formal warrant of arrest issued by a criminal court, despite its notation of Bonnie as an "adult" in the information section in the box entitled "Date of Birth." The party executing the "Family Court All Purpose Warrant" is "commanded to arrest forthwith * * * and bring said person before this Court" (the Family Court). Bonnie is referred to therein as "a runaway from Pa." Nowhere does the warrant mandate, nor may it be construed as mandatory, the incarceration of Bonnie with adult criminals upon her being taken into custody. Speculation by the Law Guardian that the dictates of the Interstate Compact on Juveniles and the Family Court Act to the effect that no juvenile or delinquent juvenile be placed or detained in any prison, jail or lockup association with criminal, vicious or dissolute persons, might be violated by the arresting authority is irrelevant as the warrant issued herein is proper

---

4. This was the very procedure utilized by the Family Court on October 5, 1979, when, upon learning of Bonnie's first absconding from court-ordered placement, the court issued a warrant for her return.

in essential form and sufficiently indicates Bonnie's status as a *runaway juvenile* whose attendance *before the Family Court* is being compelled. In a cogent and well-reasoned opinion, the Supreme Court of Westchester County in 1963 concluded that the compact does not deprive the New York courts of their traditional jurisdiction as *parens patriae* of children found in this State despite the domicile of their parents *(Matter of Chin v Wyman,* 41 Misc 2d 641).[5] Embraced within the rationale of the opinion was an analysis of the jurisdiction (both subject matter and in personam) of the Supreme Court and the Family Court relevant to the proceedings involving the welfare of minors (see, also, *Matter of Chin v Yen,* 41 Misc 2d 650). That jurisdictional analysis is fully supportive of the action taken by the Family Court Judge herein in refusing to dismiss the petition and authorizing a warrant for the return of the absconding minor before the court. Regarding the void created by the Pennsylvania court's rejection of the parent's request for a requisition without concomitantly considering the facts rele-

**5.** There the court declared: "It must be remembered that the legislation which authorized the adoption of the compact was enacted to provide for the welfare and protection of juveniles as well as that of the public, and is required to be reasonably and liberally construed to accomplish its purposes. It is expressly stated that the remedies and procedures provided by the compact are not in substitution for other rights, remedies and procedures. It is also significant that a juvenile arrested must be taken before a Judge of a court *having jurisdiction over delinquent, neglected or dependent children,* who may appoint counsel or a guardian ad litem for him. That provision would hardly be necessary, nor is it consistent with an intent that the juvenile should be delivered over to the officer appointed to receive him, and to effect his return on a determination without further inquiry into the facts that the requisition is 'in order' in the sense that it appears to have been issued in accordance with the compact provisions. *Neither does the compact when read in the light of its declared purposes attempt expressly or by fair implication to oust the Supreme Court of its traditional * * * jurisdiction * * * as parens patriae* (cf. *Finlay v. Finlay,* 240 N.Y. 429). These infants, found within the State of New York, had a right, which they were entitled to assert, despite the domicile of their parents *(Finlay v. Finlay, supra)* to invoke that jurisdiction in one of two ways: by writ of habeas corpus, if they had been taken into custody, which in controversies touching the custody of children is governed not so much by considerations of strictly legal rights as by those of expediency and equity, and above all, the interests of the children *(People ex rel. Riesner v. New York Nursery & Child's Hosp.,* 230 N.Y. 119 * * *), or by petition to the Supreme Court * * * upon which petition the court acts, as *parens patriae,* to do what is best for the welfare of the child *(Finlay v. Finlay, supra).* The compact does not therefore in any way affect the jurisdiction of this court. Neither does it affect *similar jurisdiction* with respect to custody of minors granted to the Family Court by constitutional amendment effective over seven years after the compact was executed (N.Y. Const., art. VI, § 13, subd. b, par. [2]) no matter what its intent may be. It follows that whether the custody proceeding shall be heard in this court, or, as has been suggested, in the Family Court, the infants will receive a hearing at which they will be permitted to develop the facts and *in which the decision must rest solely on consideration of their welfare (Finlay v. Finlay,* 240 N.Y. 429, *supra)* and their best interests must prevail even over the so-called paramount rights of their parents *(Matter of Bock,* 230 N.Y. 349), the previous determination of the Massachusetts court [the home State] *(Matter of Bachman v. Mejias,* 1 N.Y. 2d 575), and any inconsistent requirement of the compact. Presumably it was to insure that such a determination would be made that the infants were declared to be wards of the Family Court" *(Matter of Chin v Wyman, supra,* pp 647-649; emphasis supplied).

vant to whether in the best interests of the minor it would be in order for such court, or appropriate interested Pennsylvania public officials, to undertake a proceeding which would place custody of the juvenile in someone else's hands, the Juvenile Compact Procedure Manual, section 100 (p 7) states: "A special problem arises when the *Parents Do Not Object* to the juvenile's remaining out of state even though he left without permission. In the ordinary course of events, it is presumed that when the child has been found and detained in the asylum state the parents at home will initiate the petition for the child's return. If the parents show no such interest in seeking the return of the child, it would then be in order for the appropriate court at home (and interested public officials) to undertake a proceeding which would place custody of the child in someone else's hands if a review of the facts indicate that return is in the best interests of the child." Indeed, anticipation of the problem presented when the home State under the compact fails to observe the spirit and intent of the statute by not inquiring into and reviewing the facts surrounding the child's present condition in the asylum State with a view toward upholding the child's best interest, is implicit by the following remedial observation set forth in section 407 of the Juvenile Compact Manual (pp 23-24): "A question was raised * * * regarding the Compact Administrator's authority *to compel courts to follow the terms of the Compact* and the rules and regulations promulgated by the Compact Administrators. The Association's[6] counsel said the proper legal remedy would be mandamus, but he pointed out that legal proceedings might not be practical. He suggested that *greater efforts* should be made *to inform* courts about Compact procedures, and he also called attention to the possibility of enacting statutes placing responsibility for the channelling of Compact cases in the hands of the Compact Administrators" (emphasis supplied). The active co-operation between States envisioned by the Interstate Compact on Juveniles is similar to that envisioned in the Uniform Child Custody Jurisdiction Act adopted by both New York (Domestic Relations Law, §§ 75-a to 75-z) and Pennsylvania (11 P.S., §§ 2301-2325). A vital interrelation between the Interstate Compact on Juveniles and the Uniform Child Custody Jurisdiction Act may be perceived in section 75-d (subd 1, pars [c], [d]) which envisions, *inter alia,* the assumption of jurisdiction in the best interest of the child to protect the child under certain circumstances. It suffices to conclude by noting that the Interstate Compact on Juveniles does not require a technical and restrictive interpretation of the role of the asylum State as a "rubber stamp" of the judicial branch of government of the home State. If such were the case, then the authority of the courts of the asylum State to which the infant absconds would be severely circumscribed and in essence would exist as an appendage of the judicial machinery of the home State. This view would impel the asylum State to act or not to act solely with regard to the home State's issuing or not issuing a requisition for the runaway in complete disregard to any plaint that the best interest of the child be considered by the asylum State. It would create an inequitable and troubling distinction between runaway children based solely on the fact of whether they are out-of-State runaways or are absconding from home in New York. To adopt the majority conclusion herein is to

---

**6.** The compact administrators of the various states "banded together in an Association, adopted Articles of Organization, promulgated official rules, regulations and forms concerning the Compact, and made a number of interpretations and policy decisions" (Juvenile Compact Manual: Foreward and Notes on Use of the Manual, index, p B [1976 ed]).

regard the New York Courts as powerless to intercede for runaway youths when their best interest demand that intercession because the home State has theretofore issued a requisition which thereby frustrates the asylum court's role as *parens patriae* or because the home State has decided not to issue a requisition which similarly frustrates the asylum court's role as *parens patriae.* In effect, the majority have legislated article 2 out of the Interstate Compact on Juveniles under the guise of judicial interpretation and construction. The *novel* question presented by this appeal in a matter involving an infant who is a ward of the court, has been summarily disposed of by the majority in the simple proposition that under the Interstate Compact on Juveniles, the jurisdiction of the asylum State's court over the infant immediately and automatically ceases upon the initial dismissal by a court of the home State of the application of the parent(s) for a formal requisition. By logical extension of this simplistic approach, it may be observed that in consequence of such initial dismissal no opportunity would be afforded the parent(s) to renew the request because the custody of the child would be lost by the asylum state's court and no opportunity would be afforded the asylum state's court to seek the co-operation of the home State's court and public officials. Surely, such an ill-conceived result was not intended to be accomplished under the compact. Succinctly stated, it is my considered view that even assuming the Interstate Compact on Juveniles is viewed without article 2 (the result achieved by the majority herein), such compact at the very least permits, indeed mandates, that the asylum State's custody (jurisdiction) be continued "for such a time not exceeding ninety days" (L 1955, ch 155, § 1, art 4) to afford the States and the parties involved an opportunity to co-operate and address and vindicate the best interest of the juvenile under the compact. Where infants are involved, the law abhors cavalier treatment respecting their welfare, rights and best interest. The compact sounds the keynote in declaring that "It shall be the policy of the states party to this compact to cooperate and observe their respective *responsibilities"* (L 1955, ch 155, § 1, art 1; emphasis supplied). In endeavoring to act *responsibly,* the Family Court fulfilled its mandated obligation to the infant Bonnie and did not extend to her sympathy without substance. Accordingly, the order of the Family Court, New York County, entered December 17, 1979, which, *inter alia,* denied the juvenile's motion to dismiss for lack of jurisdiction, should be affirmed.