OPINION OF THE COURT
Stanley Gartenstein, J.
A motion before the court raises issues of first impression common to both the juvenile and criminal justice systems. Does a juvenile respondent (or adult defendant) have a constitutionally protected right to counsel at the posttrial presentence investigational stage of proceedings, specifically, at his interviews with an investigating probation officer. Interestingly, this application comes before the juvenile justice system first, thereby departing from an ad hoc tradition which usually sees constitutional issues first decided in the criminal justice system; then, once recognized there, applied by analogy on a right-by-right basis in the juvenile system (cf. Matter of Gault, 387 US 1; Matter of *37 Winship, 397 US 358; McKeiver v Pennsylvania, 403 US 528; Matter of Jeffrey C., 81 Misc 2d 651.)
Because the result herein may ultimately have a significant impact upon day-to-day operations of the Department of Probation which is charged with statutory responsibility for presentence investigation of every juvenile and adult, the court has accepted argument from counsel to the Commissioner of Probation and from the Corporation Counsel of the City of New York on behalf of the court’s mental health clinic which would be similarly affected. The mental health authorities vigorously oppose this relief. The Department of Probation consents to the extent of having the court allow counsel to be present at the interview but not to participate.
Inasmuch as all concede that the court may only grant relief on constitutional grounds, it has made clear that it will obviously not be bound by any consents on record.
THE FACTS
Respondent has been found guilty of possessing a sawed-off shotgun at the time and place alleged in the petition. The original complainant and chief witness against him was his sister who initiated proceedings by bringing the alleged contraband into the police precinct with a claim that she found it in an abandoned apartment to which respondent had access. There is a history of bad blood between respondent and his sister. At the time this motion was brought he was also under accusation of having committed an armed robbery with a gun. In the interim, between the initiation of this motion and the formal decision thereon, he was acquitted of this charge based upon testimony from a highly regarded social worker attached to a court related program to the effect that he was physically in attendance at that program at the time the alleged robbery was committed. Upon instructions from his counsel, he has refused to be interviewed by the investigating probation officer without his attorney being present.
ESTELLE V SMITH
In 1981, the Supreme Court turned its attention to due process issues presented by a Texas statute granting a defendant liable for the death penalty a bifurcated trial. *38 Under this statutory scheme the second stage of proceedings is concerned exclusively with punishment — viz., imposition of the ultimate penalty, and calls upon the same jury which decided the underlying issue of guilt or innocence to again act on the imposition of the death penalty. (.Estelle v Smith, 451 US 454.) The defendant had been examined by a psychiatrist prior to trial for the purpose of determining his competency to stand trial. The jury resolved this issue as well as that of guilt or innocence on the case-in-chief against defendant. Thereafter, in the penalty phase of proceedings, the same jury was called upon to decide three questions, one of which was defendant’s future propensity for dangerousness. The same psychiatrist who testified as to competency then testified at the second trial without conducting a new examination, concerning future propensity for dangerousness. When this issue was resolved against defendant, together with the two remaining ones, the death penalty was mandated. The testimony of the psychiatrist was received under objection. Following a mandatory sentence of death, appellate proceedings ultimately came before the Supreme Court which held that because counsel had been denied defendant at the psychiatric interview, a “critical phase” of the proceedings within the meaning of Matter of Gault (387 US 1, supra), reversal was mandated. In doing so, the high court based its holding on Fifth Amendment protections vis-a-vis defendant’s right to remain silent at the interview and upon the crucial lack of a reading of his rights to him prior thereto. Peripherally, the court also made reference to denial of defendant’s Sixth Amendment right to the assistance of counsel.
The ruling in Estelle may be cogently summarized by quoting from the majority opinion by the Chief Justice (pp 462-463):
“The Court has held that ‘the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.’ In re Gault, 387 U. S. 1, 49 (1967). In this case, the ultimate penalty of death was a potential consequence of what respondent told the examining psychiatrist. Just as the Fifth Amendment prevents a criminal *39 defendant from being made ‘ “the deluded instrument of his own conviction,” ’ Culombe v. Connecticut, supra, at 581, quoting 2 Hawkins, Pleas of the Crown 595 (8th ed. 1824), it protects him as well from being made the ‘deluded instrument’ of his own execution.
“We can discern no basis to distinguish between the guilt and penalty phases of respondent’s capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees. See Green v. Georgia, 442 U. S. 95, 97 (1979); Presnell v. Georgia, 439 U. S. 14, 16 (1978); Gardner v. Florida, 430 U. S. 349, 357-358 (1977) (plurality opinion).”
Respondent relies upon Estelle as a basis for the relief sought.
The highest court to construe Estelle to date has been the Circuit Court of Appeals for the Ninth Circuit in Baumann v United States (692 F2d 565). In this matter the Ninth Circuit ruled that Estelle must be limited to its unique facts and tempered by the reality that it involved the death penalty. Specifically holding that Estelle had no applicability to a noncapital case, the Baumann court stated (p 576): “We believe it appropriate to read Estelle narrowly. This is not a bifurcated jury proceeding involving the potential of the ultimate penalty, death. Nor is the question of ‘remorse’ which Baumann raises nearly as critical an issue in this case as was the question of future dangerousness in Estelle. In order to impose the death sentence, the state in Estelle was required to demonstrate the existence of certain aggravating factors by proof beyond a reasonable doubt. See Jurek v. Texas, 428 U.S. 262, 268-76, 96 S.Ct. 2950, 2954-2958, 49 L.Ed.2d 929 (1976) (plurality opinion). There is no similar requirement in the sentencing phase of a trial under the federal mail fraud statute, a noncapital proceeding conducted before the district court and not a jury. We conclude that there is a substantial difference between a psychiatric examination of the defendant in a capital case which seeks to elicit evidence from the defendant relating to the critical aggravating factor of dangerousness, and a ‘routine’ presentence interview, see Estelle, *40 supra, 451 U.S. at 465, 101 S.Ct. at 1874, restricted to gathering information upon which the district court, in its discretion, may rely when imposing sentence. As we read Estelle, the Court’s fifth amendment holding is limited to the distinct circumstances of the bifurcated capital proceedings presented in that case.”
Addressing the distinguishing factors between Estelle, a capital case, and its own proceedings which involved mail fraud, the court elucidated its reasons for this critical distinction (p 578): “Because the sentencing phase of the noncapital case before us does not involve an issue which is nearly as critical as was the issue of dangerousness in Estelle, the presentence interview was not a ‘critical stage’ of the aggregate proceedings against Baumann. See Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973 (1978) (in noncapital cases, individualized sentencing procedures stem from public policy enacted into statutes, rather than the Constitution).”
To be sure, Baumann has not received universal acclaim. In United States v Sauer (see 33 Grim L Rep 2069, 2070 [March 14, 1983]) the United States Court of Military Appeals criticized it in the following terms: “There have been suggestions that the Supreme Court’s refusal to distinguish between the guilt and penalty phases of Smith’s murder trial was based on its being a capital case. See Baumann v. U.S. That view would be plausible if the majority opinion in Estelle v. Smith had referred to the Eighth Amendment or related its decision to the imposition of cruel and unusual punishment. * * * However, the foundation for Estelle v. Smith, is provided by the Fifth and Sixth Amendments — not the Eighth — and nothing in the logic of the Court’s opinion suggests any constitutional distinction between capital and noncapital cases. Furthermore, in almost every instance heretofore in which a constitutional distinction between capital and noncapital cases has been urged — other than where the Eighth Amendment is directly involved — that distinction ultimately has been rejected. See, e.g., Gideon v. Wainwright, 372 U.S. 335 (1963).”
The foregoing excerpt may be interpreted as predicating Sauer’s reasoning on the notion that the death penalty is *41 ipso facto cruel and unusual punishment under the Eighth Amendment. We respectfully believe that the Supreme Court has never remotely hinted at this.[1]
Pragmatically, what makes Estelle so unique is the fact of life that the current Supreme Court in speaking of the death penalty, does so for posterity and justifiably views its ultimate stance on this issue as one of those barometers by which future generations will judge our society. As cogently summed up in a perceptive lay analysis by Linda Greenhouse in the New York Times (May 17, 1983, p A24): “But form as well as substance has always mattered in capital cases. The death penalty, as the Supreme Court has often said, is different, each procedural step on the road to execution heavy with symbolism in a society that has never resolved its ambivalence over capital punishment.”
In this connection, it is of interest to note that the inordinate mystique which seems to surround psychiatric pronouncements in the courts even to an extent where Judges and juries are sometimes willing to forfeit their decision-making power in its favor is finally being dispelled in the face of our discovery that, to paraphrase the old fable, “the Emperor has no clothes.”
In a recent brief submitted to the United States Supreme Court in Barefoot v Estelle (463 US_, 103 S Ct 3383), the American Psychiatric Association conceded the impossibility of psychologically predicting a propensity for dangerousness. The APA further conceded that when psychiatrists have made these predictions, they were proven wrong in two out of every three attempts. (New York Times, April 27, 1983.) The Supreme Court in Estelle (451 US 454, supra) which had before it a brief from the American Psychiatric Association in favor of affirmance (i.e., vacatur of the death sentence) could not by any stretch of the imagination have been ignorant of the stark fact that a man’s life was to be declared forfeit upon a nebulous value judgment whose scientific accuracy was concededly less than the 50% rate of predictable accuracy achievable under the laws of chance by flipping a coin.[2] Faced with this *42 potential grotesque injustice, we respectfully believe that the court arrived at the result a priori and devised the reason for it a fortiori. Mr. Justice Benjamin Cardozo in describing this phenomenon, quotes the French legal philosopher Saleilles, writing on this aspect of the judicial process: “ ‘One wills at the beginning the result; one finds the principle afterwards; such is the genesis of all juridical construction. Once accepted, the construction presents itself, doubtless, in the ensemble of legal doctrine, under the opposite aspect. The factors are inverted. The principle appears as an initial cause, from which one has drawn the result which is found deduced from it.’ ” (Cardozo, Nature of the Judicial Process, p 170.)
If this analysis is correct — if the result in Estelle came before the reasons for it, the logical course of action for the high court in having the reasons concur with the result, would be the defining of a constitutionally mandated right to counsel at the psychiatric interview. We thus arrive as did Baumann at the one overwhelming factor which has and will continue to distinguish Estelle from any lesser state of facts in which the death penalty is not at stake.
Additionally, Estelle involved an almost classic instance of bad faith by the State by virtue of which the defendant submitted to a psychiatric interview for one purpose, only to find his life in jeopardy when the State attempted to misuse it. This aura of bad faith is lacking here. The predispositional probation interview to be conducted here is exactly as represented.
We therefore hold that Estelle has no applicability to the matter at bar. Having so held that there is no constitutionally mandated right to the relief sought (i.e., as imposed by a minimum standard adequate to pass the muster of constitutional review by the Supreme Court), the next consideration is. whether or not this State by virtue of the holdings of its own highest court, has exercised its right to impose a higher constitutional standard than that minimum required by the Supreme Court. Paraphrased: is there a constitutional right to the presence of counsel at *43 the probation interview as this right is defined by the courts of New York?
MATTER OF LEE V COUNTY CT. OF ERIE COUNTY
In 1971, a decade in advance of the efforts of the Supreme Court in Estelle, the Court of Appeals focused on issues of self incrimination as they interface with a court-ordered psychiatric examination of a criminal defendant and his right to the presence of counsel thereat. In Matter of Lee v County Ct. of Erie County (27 NY2d 432), the defendant interposed insanity as a defense in a prosecution for a double homicide. At the court-ordered psychiatric examination, he refused to answer the psychiatrist’s questions. The Court of Appeals, with reasoning which might be said to supplement that which was later utilized by the Supreme Court in Estelle, held that defendant waived the privilege against self incrimination by interposing insanity as his defense. Accordingly, his refusal to participate in the psychiatric interview met with the appropriate sanction of preclusion of his own psychiatric testimony. In affirming the Appellate Division’s order for a new psychiatric examination, the Court of Appeals held that defendant had a right to the presence of counsel at the reexamination, but not his active participation, stating (p 443): “Although these pretrial examinations usually occur after arraignment or indictment, our guarantee of counsel at this stage (see, e.g., People v. Waterman, 9 N Y 2d 561; People v. Di Biasi, 7 N Y 2d 544) has not heretofore obtained at examinations ordered pursuant to section 658 of the Code of Criminal Procedure. In People v. McKie (25 N Y 2d 19, 24) we analyzed the postarraignment guarantee of counsel writing that ‘in order to protect the accused’s Fifth Amendment privilege against self-incrimination, the Sixth Amendment right to counsel had to attach during the pretrial period after the judicial proceeding had commenced either by indictment or arraignment.’ However, since we hold herein that the accused’s privilege is waived during pretrial-examination, there is nothing to protect and no right to counsel attaches under this rule.”
It thus appears that this State’s recognition of the right to counsel at the pretrial psychiatric interview is judicially grounded strictly on a waiver of privilege and the concomí *44 tant lack of that protection which counsel might afford at this critical stage of proceedings during which the presumption of innocence is still in effect and unrebutted. In short, Lee is in close apposition to Estelle.
Although the courts of this State have never limited Lee to capital cases, what was and remains to be as self-evident in Lee as it is with Estelle, is the fact that homicide was the crime in issue and that even in the face of statutory abolition of the death penalty in New York,[3] nevertheless punishable by the maximum penalty imposable under existing law. Regardless of what other distinguishing factors may exist, this overwhelming reality deserves due consideration. Conversely, what stands out in stark juxtaposition, is the fact that potential exposure in this delinquency proceeding will, at worst, be a disposition tailored, among other statutory factors, to the best interests of the respondent. We fully recognize that some of the worst injustices perpetrated by the State upon those too often finding themselves trapped in a system devised by the “haves” are feebly “justified” on the basis of the so-called “best interests” of those trampled in the process.[4] Nevertheless, we respectfully believe that with all its defects, and in spite of the recent shift in emphasis[5] the basic thrust of these proceedings was and remains protective in nature.
We turn now to this State’s application of Estelle v Smith (451 US 454, supra).
*45 (A) PEOPLE V JAGNJIC
In 1982, the Appellate Division, First Department, confronted with one of those frustrating instances of an incomprehensible heinous crime committed by an otherwise faultless defendant (People v Jagnjic, 85 AD2d 135) took the occasion to cite Estelle v Smith (supra). Defendant, prosecuted for the aggravated sexual abuse of his 10-year-old niece, pleaded guilty to a variety of felony charges relying on a plea bargain whereby he would be sentenced to an indeterminate term of not less than 5 nor more than 15 years. He then appealed from the negotiated sentence after its imposition. In a 3 to 2 decision which generated four separate opinions, the Appellate Division, First Department, reversed and remanded for resentence after psychiatric evaluation. The four respective opinions represent an interesting compilation of the sentencing philosophies of the individual Justices; each relies heavily on the unique underlying facts. Justice Kupferman, writing for the “majority” (opinion concurred in by Bloom, J.; concurring opinion for majority result by Sandler, J.; separate dissenting opinions by Murphy, P. J., and Lupiano, J.), makes the following fleeting footnote reference to Estelle (People v Jagnjic, supra, p 136): “It is assumed that by this appeal the defendant has waived any privilege with respect to the use of a psychiatric report. (See Estelle v Smith, 451 US 454.)”
We find nothing in this reference to Estelle to support the application before us even though cited by Justice Kupferman in a noncapital case. We respectfully believe that this citation of Estelle was for the purpose of underscoring generally the importance which a psychiatric evaluation can have in sentencing and was for its background applicability rather than in support of any specific proposition of law. To support this view, consider simply that it was the defendant himself who urged the absence of a psychiatric examination as a basis for reversal; that to recognize his argument and then hold the contents thereof privileged would have constituted a manifest absurdity. Further, the obvious fact that Jagnjic was decided on its unique facts coupled with the reality that its footnote reference to *46 Estelle was dictum, significantly diminishes its value as precedent. Succinctly, if a nisi prius court is to recognize the constitutional basis of the relief requested, this recognition will simply have to be grounded in a more solid foundation.
(b) people v segal (54 NY2d 58)
In the above matter, the Court of Appeals dealing with a conviction for perjury in connection with nursing home kickbacks had occasion to cite Estelle almost as corollary to Lee, when the issue involved the trial court’s striking of defendant’s psychiatric testimony for failure to submit to an examination as ordered. The court stated (p 64): “The trial court’s ruling was expressly based on our decision in Matter of Lee v County Ct. of Erie County (27 NY2d 432). In that case we held that a defendant who raises the defense of insanity waives his Fifth Amendment privilege against self incrimination with respect to his mental capacity and, if he refuses to submit to a mental examination requested by the prosecutor, the court may preclude the defendant from introducing expert testimony on his own behalf. The defendant has not suggested that this procedure is constitutionally flawed (cf. Estelle v Smith, 451 US 454).” While cited in a noncapital case, this reference in no way appears to favor an extension of the right to counsel to the probation interview inasmuch as the investigation in question was limited to substantive preverdict proceedings as it was in Lee.
(c) PEOPLE V BALDENKO
Finally, in People u Baldenko (111 Misc 2d 605), involving a prosecution for robbery, the Supreme Court of Queens County distinguished Estelle specifically on the basis of its being decided in a capital case and held it to be inapplicable to the facts before it.
CONCLUSION
The relief sought is not mandated by the Supreme Court via Estelle, or by the Court of Appeals via Lee, or by any appellate decision in this State applying either or both.
Inasmuch as the Department of Probation has consented to the relief sought, the motion is denied without prejudice to counsel’s presence at the interview through informal arrangements should the individual probation officer consent.
*47 We respectfully believe that the effect of counsel observing probation’s performance with a critical eye cannot help but inure to the benefit of the entire system’s integrity. The fact that we hold this relief to be outside the parameters of constitutional mandate does not imply that we are blind to the salutary effect which any open proceeding can have on public confidence in the system.

. Cf. Furman v Georgia (408 US 238). The concurring opinion by Mr. Justice Stewart (p 306) points out that only two of his colleagues on that Bench conclude that the death penalty is ipso facto cruel and inhuman punishment.

. The choice of this phrase is no attempt to be facetious. For a perceptive analysis of *42 psychiatric evidence in the courtroom, see Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, Ennis and Litwack, 62 Cal L Rev.

. A picture of New York’s evolving stance as to the death penalty both legislatively and judicially, may be obtained by referring to chapter 367 of the Laws of 1974; People v Davis (43 NY2d 17); People v Fitzpatrick (32 NY2d 499).

. The Circuit Court of Appeals for the Second Circuit has articulated these concerns in an eloquent footnote in Duchesne v Sugarman (566 F2d 817, 828, n 24): “Of course, the deprivation of liberty involved here was purportedly based on the ‘best interests’ of the children and hence is not precisely akin to that caused by an arrest. Nevertheless, ‘[alf all tyrannies a tyranny sincerely exercised for the good of its victims may be the most oppressive ... [Tlhose who torment us for our own good will torment us without end for they do so with the approval of their own conscience.’ Goldstein, supra note 19, at 645, quoting, Lewis, The Humanitarian Theory of Punishment, 6 Res Judicatae 224, 228 (1952).”

. The Juvenile Justice Reform Act of 1976 amended section 711 of the Family Court Act to provide that the thrust of proceedings under article 7 of the Family Court Act was to include the protection of the community as well as the needs of the respondent. Until that time, the latter consideration was exclusive. To underscore its intent, the Legislature directed that this particular amendment be effective immediately as opposed to a later date for other provisions of the reform act.